**YAKAMA INDIAN NATION,**
Plaintiff/Intervenors,

v.

**Juan FLORES, et al., Defendants.**

**Ronald CREE, Jr., et al., Plaintiffs,**

v.

**Juan FLORES, et al., Defendants.**

**WHEELER LOGGING, Plaintiff,**

v.

**Annette SANDBERG, et al., Defendants,**

v.

**Federico PENA, United States Secretary of Transportation, Third Party Defendant.**

Nos. CS–89–458–AAM, CY–92–3100–AAM.

United States District Court,
E.D. Washington.

Feb. 12, 1997.

Timothy R. Weaver, Cockrill & Weaver, Yakima, WA, Elizabeth F.M. Nason, Yakama Nation Office of Legal Counsel, Toppenish, WA, for Cree plaintiffs and Yakama Indian Nation, plaintiff-intervenor.

Jack Warren Fiander, While Swan, WA, for plaintiff Wheeler Logging.

Fronda C. Woods, Attorney General of Washington, Licensing Division, Olympia, WA, for defendants.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

McDONALD, Senior District Judge.

Once again the court must determine whether the Treaty With the Yakamas of 1855 (hereinafter "Treaty") precludes the State of Washington from imposing licensing

and permitting fees on logging trucks owned by the Yakama Indian Nation or its members. At the summary judgment stage of these proceedings, the court ruled in favor of plaintiff-intervenor Yakama Indian Nation after dismissing the claims of the individual plaintiffs. Ct.Rec. 180. The court found that the phrase "in common with," as interpreted in Treaty fishing cases, applies to the public highways clause of the Treaty, and thus precludes the imposition of truck licensing and permitting fees on Indian-owned trucks. *Cree v. Waterbury*, 873 F.Supp. 404 (E.D.Wash.1994). The Ninth Circuit reversed, holding that the court must engage in a fact-finding inquiry to discern what the parties to the Treaty intended. *Cree v. Waterbury*, 78 F.3d 1400 (9th Cir.1996).

Accordingly, on November 4, 1996, a bench trial commenced in the above-mentioned consolidated actions. Timothy R. Weaver, Cockrill & Weaver, Yakima, Washington, represented the individual *Cree* plaintiffs and plaintiff-intervenor Yakama Indian Nation, and Elizabeth F.M. Nason also appeared on behalf of the Yakama Nation. Jack W. Fiander represented plaintiff Wheeler Logging. Assistant Washington State Attorney General Fronda Woods represented state defendants.

## SUMMARY

The Confederated Tribes and Bands of the Yakama Indian Nation (Yakama Nation) and the individually-named plaintiffs [1] in these consolidated actions brought suit seeking a declaration of their rights under Article III, paragraph 1, of the Treaty with the Yakamas, regarding the right of the Yakama Nation and its members to operate vehicles on public highways within Washington state.

Specifically, plaintiffs seek a declaration by the court that Article III, paragraph 1, reserves to the Yakama Nation and its members the right to take tribal goods to market over the public highways of Washington state free from state registration requirements and applicable licensing and permitting fees.

However, plaintiffs do not oppose truck registration with the State for purposes of identification. Further, plaintiffs do not seek exemption from weight regulations applicable to Indian-owned logging trucks or from fines issued for non-compliance with those regulations. Rather, plaintiffs argue that the Treaty precludes the State from exacting a fee, either directly or indirectly, for compliance with those regulations. Additionally, the Yakama Nations seeks a declaration that it has the sovereign authority and Treaty-reserved right to regulate the conduct of its members in exercising the right to travel the public highways without interference by the State.

Alternatively, plaintiffs argue that Washington licensing and permitting fees, as currently applied to Indian-owned trucks, are barred by the Supremacy Clause of the United States Constitution because such fees are not pro-rated for off-reservation use as required under *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Defendants deny all claims of plaintiffs and assert that the Treaty does not reserve a right to travel the public highways free of applicable licensing and tonnage fees. Additionally, defendants deny that the Supremacy Clause bars the challenged fees and registration.

### A. Facts of Dispute

Washington state law requires registration of personal automobiles with an accompanying flat registration and licensing fee. *See* RCW § 46.16.010. Vehicles owned by individual Indians have never been exempt from Washington vehicle registration fees. Since 1915, Washington has required registration and licensing of trucks according to gross weight, with higher weights bearing higher licensing fees. RCW §§ 46.16.070, 46.16.135 (monthly tonnage licenses), 46.44.095 (temporary tonnage permits).[2] Trucks owned by

---

**1.** Unless otherwise specified, the court refers to all collective plaintiffs, including the Yakama Nation, as "plaintiffs." Additionally, references to

Court Records refer to those in *Cree*, CS–89–0458–AAM.

**2.** According to defendants' trial brief, owners of trucks are not required to pay a separate regis-

individual Indians have never been exempt from such license fees. In addition, Washington requires log tolerance permits for certain overweight trucks with payment of an accompanying fee. RCW §§ 46:44.047, 46.44.095 (temporary tonnage permit). Again, individual Indians have never been exempt from such fees. Washington law establishes traffic infractions for violations of the weight licensing requirements, such as failure to obtain proper licensing and permits, and impose penalties for such violations. RCW §§ 46.16.010, 46.16.135, 46.16.140, 46.16.145. Fees paid to the State of Washington for truck registration, licensing, and log tolerance permits are credited to the state motor fund and used primarily for highway purposes. RCW §§ 46.68.030, 46.68.035.

Plaintiff–Intervenor Yakama Nation sells timber from lands held in trust by the United States for the benefit of the Yakama Nation and its members. Under the supervision of the Bureau of Indian Affairs, the Yakama Nation enters into timber sales contracts with purchasers. When possible, purchasers of tribal timber must employ tribal members. *See* Testimony of Kip Ramsey; P–54 (Stipulated testimony of Delbert Wheeler).

*Cree* and *Wheeler* plaintiffs operate logging trucks that haul logs from tribal timber sales within reservation lands to off-reservation mills. *Cree* plaintiff Richard "Kip" Ramsey is the owner of Tiin–Ma Logging Company. Ramsey began his logging business in 1978 and was the first Indian logger to haul tribal timber off-reservation. The other named *Cree* plaintiffs are employed as drivers for Tiin–Ma and, with the exception of Douglas Beebe, are enrolled members of the Yakama Nation. Delbert Wheeler is the owner of plaintiff Wheeler Logging and is an enrolled Yakama Indian. Wheeler Logging began operations in 1987.

Defendants are officers authorized to issue traffic citations for violations of vehicle registration, licensing and permitting statutes. Plaintiffs brought suit after defendant officers issued traffic citations to Tiin–Ma and Wheeler Logging drivers because Kip Ramsey and Delbert Wheeler neither paid applicable tonnage licensing fees nor obtained log tolerance permits for their trucks. Recently, defendant officers began issuing citations to Tiin–Ma and Wheeler drivers for the failure to possess proper registration. All of the state enforcement actions challenged in this case happened outside the boundaries of the Yakama Indian Reservation.

Plaintiffs claim that the Treaty with the Yakamas protects their right to haul tribal timber to market over state highways without restriction, and therefore the state cannot impose licensing and permitting fees on logging trucks owned by the Yakama Nation or its members. They allege that the officers have deprived plaintiffs of their rights under the Treaty.

### B. Procedural History

*Cree* plaintiffs filed suit against the State of Washington and several of its officers on July 3, 1989. On June 1, 1991, the court granted *Cree* plaintiffs' motion for a preliminary injunction. Ct.Rec. 48. The court enjoined defendants from issuing citations to Tiin–Ma Logging Company or its drivers for violations of the laws of Washington that are based on the failure to obtain tonnage licenses under RCW 46.16.070 or the failure to obtain log tolerance permits under RCW 46.44.047. The court further enjoined defendants from impounding or threatening to impound Tiin–Ma's trucks for similar violations.

On June 17, 1991, the court issued an order granting in part and denying in part

---

tration fee. Rather, Washington collects a licensing fee based on gross weight. RCW § 46.16.070. However, failure to pay such fees is a violation of RCW §§ 46.16.070, 46.16.135, and 46.16.010, as a truck owner cannot register the vehicle without proper licensing.

Pursuant to their amended complaints, plaintiffs' challenge the registration requirements pursuant to RCW § 46.16.010, which requires the appropriate licenses before an owner may register a vehicle in the state. Plaintiffs also challenge the requirement that all tribal members must register their trucks with the state as a violation of the Yakama Nation's sovereign authority and Treaty-reserved rights to regulate the conduct of its members both on and off the reservation. Ct.Rec. 219. However, in the parties' joint pretrial order, plaintiffs maintain that they do not challenge registration for identification purchases. Ct.Rec. 294.

1234

defendants' first motion for partial summary judgment. Ct.Rec. 49. The court granted the motion to dismiss all claims against the State of Washington; granted the motion to dismiss all claims for damages against the defendant officers in their official capacities; and granted the motion to dismiss the claims for injunctive relief against former defendant Waterbury as he was no longer employed by the State Patrol. The court denied defendants' motion to dismiss the damages claims against the officers in their individual capacities based on qualified immunity. On appeal, the Ninth Circuit Court of Appeals reversed the court's ruling on qualified immunity. Ct. Rec. 80. The Circuit held that the officers were entitled to qualified immunity because the claimed treaty right was not clearly established at the time the officers issued the citations.

Wheeler Logging filed suit on September 8, 1992. Subsequently, the court granted Wheeler Logging's motion for preliminary injunction. The terms and conditions of the injunction are essentially identical to those issued in *Cree.* Because the legal issues in the two cases are practically indistinguishable, the court consolidated the cases on March 6, 1993. Additionally, the court granted defendants' motion to join the United States Secretary of Transportation as a third-party defendant. Ct.Rec. 81. However, service was not perfected upon the Secretary until July 1996.

On May 11, 1994, the court ordered the individual plaintiffs to show cause why their claims should not be dismissed pursuant to the Tax Injunction Act. Ct.Rec. 112. After briefing by the parties, the court entered an order dismissing each individual plaintiff's claim challenging the financial obligations under the truck licensing and permitting laws at issue, because the court lacked subject matter jurisdiction under the Act. Ct.Rec. 133. The court then granted the Yakama Indian Nation's motion to intervene as a party-plaintiff in both the *Cree* and *Wheeler* actions.

On November 29, 1994, the court issued an order addressing five summary judgment motions. Ct.Rec. 180; *Cree v. Waterbury,* 873 F.Supp. 404 (E.D.Wash.1994). The court

ruled that prior judicial decisions regarding the Yakama Nation's fishing rights under Article III, paragraph 2, of the Treaty governed the meaning of the language "in common with" contained in the public highways clause, Article III, paragraph 1, of the Treaty. Accordingly, the court ruled that the Yakama Nation and its members retained the right to travel Washington public highways without paying highway-user fees while hauling tribal goods. The court also ruled that the Yakama Nation possessed the authority to regulate the conduct of its members in the exercise of Treaty-reserved travel rights outside of the reservation. Finally, the court found that plaintiffs could not recovery attorneys' fees under 42 U.S.C. § 1988 because their claims were not cognizable under section 1983.

State defendants appealed the court's ruling on the Treaty interpretation issue. The Ninth Circuit reversed, finding that the court erred in holding as a matter of law "that [the fishing rights cases] *defined* the term "in common with" to mean that no fees could be charged for the exercise of a Treaty right." *Cree,* 78 F.3d at 1403. Instead, the Circuit held that a "factual investigation into the historical context and parties' intent at the time the Treaty was signed is necessary to determine the precise scope of the highway right." *Id.* at 1405. Accordingly, the Ninth Circuit remanded the case to this court for such a factual inquiry.

On remand, individual plaintiffs and the Yakama Nation were given leave to amend their complaints. Plaintiffs essentially added three new claims: 1) that the Treaty With the Yakamas preempts vehicle registration requirements under RCW § 46.16.010; 2) that those registration requirements violates the sovereign and Treaty-reserved rights of the Yakama Indian Nation to govern the conduct of its members in the exercise of Treaty rights; and 3) that Washington truck license and overweight permit fees fail to meet the standards of *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) ("*Colville* ") and *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) ("*Moe*"),

because the challenged fees are not tailored to account for actual off-reservation travel. Plaintiffs sought to amend their complaints after state defendants, notwithstanding the preliminary injunctions issued by this court, began ticketing Tiin–Ma and Wheeler drivers for failing to possess proper registration under RCW § 46.10.010. *See* P–9. Proper registration cannot be obtained absent payment of the licensing and permitting fees, and therefore, individual plaintiffs, along with the Yakama Nation, challenge the registration requirements.

The United States Secretary of Transportation was served with *Cree* plaintiffs' Amended Complaint in July 1996. In September 1996, the court granted the parties' stipulated motion for dismissal of the United States Secretary of Transportation as a third-party defendant.

On October 2, 1996, the court denied defendants' Motion for Partial Summary Judgment regarding the vehicle registration claim included in plaintiffs' Amended Complaints. Ct.Rec. 281. The court ruled that the federal heavy vehicle use tax, 26 U.S.C. § 4481, did not abrogate any Treaty right held by the Yakamas to be free from state vehicle registration requirements. Also in October 1996, the parties cross-moved for summary judgment regarding plaintiffs' claims under *Colville* and *Moe.* As the issues in these motions constitute plaintiffs' alternative ground for relief, the court reserved ruling on the motions until a determination of the factual issues.

### LEGAL STANDARDS

The Ninth Circuit ruled that this court must "examine the Treaty language as a whole, the circumstances surrounding the Treaty, and the conduct of the parties since the Treaty was signed in order to interpret the scope of the highway right." *Cree,* 78 F.3d at 1405. The court first sets forth the pertinent standard for interpreting treaties with Indian tribes.

■ According to well-established canons of construction, treaty language must be construed as the Indians would naturally have understood such terms, with doubtful or ambiguous expressions resolved in the Indians' favor. *See United States v. Winans,* 198 U.S. 371, 380–81, 25 S.Ct. 662, 663–64, 49 L.Ed. 1089 (1905); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 676, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979) (*"Fishing Vessel"*); *Tulee v. Washington,* 315 U.S. 681, 684–85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). Consequently, courts have adopted a liberal rule of construction with respect to Indian treaties which the Supreme Court has repeatedly relied upon in construing the terminology of Article III of the Treaty. *Fishing Vessel,* 443 U.S. at 676, 99 S.Ct. at 3069 ("This rule, in fact, has thrice been explicitly relied on by the Court in broadly interpreting these very treaties in the Indians' favor").

■ If the treaty language is unambiguous, a court must construe the treaty in accordance with its plain meaning: "[C]ourts cannot ignore plain language that, viewed in historical context and given a fair appraisal, clearly runs counter to a tribe's later claims." *Oregon Dep't of Fish and Wildlife v. Klamath Indian Tribe,* 473 U.S. 753, 774, 105 S.Ct. 3420, 3432, 87 L.Ed.2d 542 (1985) (internal quotes and citations omitted). In other words, if the language of the Treaty—as naturally understood by the Yakamas—is unambiguous, the court need go no further in its analysis. Conversely, if the court finds the language of the Treaty ambiguous, the court must construe such terms in a manner favorable to the Yakamas.

■ Defendants repeatedly argue that plaintiffs bear the burden of proving that the "parties to the Yakama Treaty intended that the Treaty would preempt state highway-user taxes and vehicle registration laws." State Defendants' Trial Brief at 7. However, according to the canons of construction recited above, plaintiffs need only show that the Yakamas understood the Treaty language to secure their right to travel on the public highways without restriction, thus precluding state registration requirements and licensing and permitting fees for Indian-owned vehicles carrying tribal goods to market.

The Ninth Circuit similarly discarded defendants' argument when it remanded this case for trial:

> The State argues that the Yakamas bear the burden of proving a tax exemption in the Treaty. However, in interpreting a treaty between the United States and an Indian tribe, the court must interpret the treaty "in the sense in which [the treaty] language would naturally be understood by the Indians." *Washington v. Washington Commercial Passenger Fishing Vessel Ass'n ("Fishing Vessel")*, 443 U.S. 658, 675–76, 99 S.Ct. 3055, 3067, 61 L.Ed.2d 823 (internal quotation marks omitted). Treaties are "broadly interpret[ed]" in the Indians' favor. *Id.*

*Cree*, 78 F.3d at 1403. Even so, defendants are partially correct in that the canons of construction do not shift the burden from plaintiffs to defendants for the purpose of showing how the Treaty was understood by the Yakamas. Nevertheless, in construing the Treaty, the court is required to examine the language of Article III, paragraph 1, as such terms were understood by the Yakamas.

## EVIDENCE OF PARTIES' INTENTIONS

In determining the intent of the parties to the Treaty, the court considered the testimony of three expert witnesses presented by plaintiffs and defendants. Additionally, the court heard the testimony of Kip Ramsey, Delbert Wheeler (P–54), and two state employees, one from the State Department of Transportation and one employed as a terminal audit manager for the Washington State Patrol. Finally, the court reviewed the exhibits identified in Appendix II of this Opinion. In light of the court's findings and conclusions, the court finds it beneficial to describe the backgrounds of the pertinent expert witnesses.

William Yallup, a full-blood Yakama Indian, testified on behalf of the plaintiffs. Mr. Yallup was born in 1926 in Ellensburg, Washington, and raised mostly in Toppenish, Washington, by his paternal grandparents. Yallup testimony at p. 6. He also spent time with his grandfather in Rock Creek, Klickitat County. Mr. Yallup's ancestors, including his grandparents and parents, were members of tribal bands comprising the Yakama Nation. Mr. Yallup speaks Yakama, Nez Perce, and some Umatilla language. *Id.*

Mr. Yallup was taught the meaning of the Treaty by his grandparents. Three ancestors of Mr. Yallup signed the Treaty, including two of the three primary chiefs that spoke on behalf of the Yakamas at the Treaty negotiations, Kamiakin and Skloom. *Id.* at p. 6; P–2 at p. 34. Mr. Yallup testified that his grandfather knew Kamiakin and Skloom and others who were present during the treaty negotiations. Mr. Yallup was twenty-eight years old when his grandfather died. Yallup testimony at p. 6.

Mr. Yallup has served almost continually on the Yakama Nation Executive Committee for the past 25 years. From 1985 to 1990, he served as the Director and Cultural Specialist of the Committee.

Dr. Deward Walker also testified as an expert on behalf of plaintiffs. Dr. Walker possesses a Ph.D. in anthropology, the comparative study of past and present human cultures.[3] Specifically, Dr. Walker is an expert in ethnology, characterized as the comparative interpretation of cultures based on their history, structure, and functioning. Walker testimony at 3. Dr. Walker has spent his career studying the culture of Native American tribes, particularly those of the Northwest Plateau. *Id.* at p. 5. Plaintiffs submit that Dr. Walker is the "premier expert" on the ethnohistory and anthropology of the Plateau Tribes, which comprise the tribes between the Cascade and Rocky Mountains and include the Yakama Nation. *Id.* at p. 7.

According to Dr. Walker, the basic goal of anthropology is to understand a particular culture, such as that of a Native American tribe, through direct participation. Dr. Walker explained:

> As part of that one then needs to acquire understanding of the language, of the history, of the social institution, of the lives of

---

**3.** The curriculum vitae of Dr. Walker was admitted as evidence during trial and thoroughly describes Dr. Walker's education and accomplishments.

key individuals, to include such things as leadership. We need to understand in a rounded full sense as much of the culture of an operating system as possible.

Walker testimony at p. 8. Dr. Walker first began working with the Yakama tribe in the 1950s and has written several publications about the Plateau Indians which indirectly relate to the Yakama Indians. Over the years, Dr. Walker has worked with several members of the Yakama Nation, including a cultural historian. *Id.* at p. 10.

Dr. Kent Richards, a professor of history at Central Washington University, testified on behalf of state defendants.[4] Trained as a historian, Dr. Richards has written extensively on Isaac I. Stevens, the Territorial Governor of Washington at the time of the Treaty. In the context of this proceeding, Dr. Richards was asked to

> look at the Yakama Treaty in the context of U.S. Indian policy at that time in the mid 19–th century, and in the context of previous treaties, particularly to look at that clause in the treaty relating to roads, and to look at the way that that clause was carried out and interpreted after the treaty.

Richards testimony at p. 6. In formulating his opinions, Dr. Richards almost exclusively consulted written sources; he did not speak with any Yakama tribal members. Instead, Dr. Richards relied upon primary sources generated by a participant or an observer at or near the time of Treaty negotiations. *Id.* at p. 7.

With all due deference to the experience and impressive credentials of Dr. Walker and Dr. Richards, the court considers Mr. Yallup the ultimate expert in this proceeding. From his early childhood, Mr. Yallup was taught the meaning of the Treaty, as understood by the Yakamas, through oral history passed down through the generations. Further, Mr. Yallup has been entrusted with the role of preserving the cultural history of the

Yakamas. Therefore, the court views his testimony with considerable respect.

The court thus proceeds to the factual inquiry mandated by the Ninth Circuit.[5]

## A. Treaty With the Yakamas of 1855

Article III of the Treaty with the Yakamas of 1855 provides:

> *And provided,* That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with the citizens of the United States, to travel upon all public highways.
>
> The exclusive right of taking fish in all the streams, where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land.

Mr. Yallup testified that members of the Yakama Nation view the Treaty as a sacred document. Mr. Yallup's early education of treaty rights involved a religious approach to rights reserved by the Treaty, specifically how the Treaty provisions pertained to the religious conduct of the tribe. Yallup testimony at p. 9. Particularly, the teachings by Mr. Yallup's grandfather involved the manner in which the future religious practices of the tribe should be conducted with respect to rights reserved by the Treaty. *Id.* at pp. 9–10.

Dr. Walker confirmed this sacrosanct view of the Treaty:

> The treaty is, in a way, a founding document. It is like a beginning point in the modern government, you might say, of the

---

**4.** As with Dr. Walker, Dr. Richard's curriculum vitae reciting his credentials was made a part of the record.

**5.** Although the court sets forth its overall findings and conclusions in the form of a memorandum opinion, the court hereby incorporates the numbered findings of fact and conclusions of law recited in Appendix I of this Opinion.

Yakama, in that they see this as something that is sacred, it needs to be observed, that it was entered into in good faith, and whose provisions need to be protected at all costs.

Walker testimony at p. 12. Dr. Walker has observed this attitude consistently in working with the Yakama Nation. *Id.* Clearly, the importance of the Treaty language to the Yakamas cannot be understated. The Treaty embodies spiritual as well as legal meaning for the tribe; it enumerates basic rights secured to the Yakamas that encompass their entire way of life. Thus, each provision in the Treaty, including Article III, paragraph 1, has special meaning.

Yet, in order to fully understand how the Yakamas understood Article III, paragraph 1, at the time the Treaty was signed, an examination into the historical context of the Treaty, including the significance of travel to the Yakamas, is essential.

## B. Historical Context of the Treaty

### 1. Significance of Travel

Prior to the signing of the Treaty, the Yakamas traveled extensively. This far-reaching travel was an intrinsic ingredient in virtually every aspect of Yakama culture. Travel was significant for many reasons, including trade, subsistence, and maintenance of religious and cultural practices. Travel was such an essential component of the Yakamas' way of life that "they could not have performed and functioned as a distinct culture in the pla[ne] in which they performed and functioned without extensive travel." Walker testimony at pp. 13–14; *see also* Richards testimony at p. 12.

Travel was particularly important for the purpose of trade. A network involving the exchange and interchangeability of goods and services existed between Indian tribes of the Northwest and surrounding areas, and the Yakamas were a central part of the network due to their location between Northwest Coast tribes to the west and the Plains tribes to the east. Yallup testimony at pp. 13–14; Walker testimony at pp. 14–15. Within this network, the Yakamas traded goods, such as dried salmon, at various tribal trade centers throughout the Northwest and beyond. P–5; P–21, D–329; Walker testimony at pp. 13–18.

The Yakamas' way of life depended on goods that were not available in the immediate area; therefore, they were required to travel to the Pacific Coast, the Columbia River, the Willamette Valley, California, and the plains of Wyoming and Montana to engage in trade. Walker testimony at pp. 14–15; Richards testimony at p. 12; P–4, P–5. Additionally, trading was constant between the fourteen bands of tribes that comprise the Yakama Nation. Yallup testimony at p. 22. Finally, Yakama Indians traded goods with non-Indians as whites expanded trading centers into the region, specifically those of the Hudson's Bay Company. P–6–8; P–14, D–218 at pp. 25–27.

Goods that Yakamas traded included fir trees, pumice-like lava rocks, horses, and most importantly, salmon. Yallup testimony at pp. 12–15. The Yakamas traded these items for goods such buffalo products, especially buffalo hide and dried buffalo meat. *Id.* at pp. 13–14. Finally, the Yakamas traded goods obtained from the Plains Indians for items from the coastal tribes. From the coastal tribes, the Yakamas primarily sought shellfish, which was significant for cultural as well as subsistence purposes. *Id.* at p. 21.

Bands that comprise the Yakama Nation, particularly the Klickitats, had a well-known reputation for being "inveterate traders." Walker testimony at p. 16; P–14, D–218 at p. 9. George Gibbs, a lawyer, ethnologist, and advisor to Isaac Stevens, remarked that their proclivity for trade was equal to that of whites, as the Yakamas constantly moved goods back and forth between the Coast and Interior and obtained access to goods from the Plains. Walker testimony at p. 16; P–14, D–218. Gibbs reported that the Klickitats exhibited a "peculiar aptitude" for trading, "purchasing from the whites feathers, beads, cloth, and other articles prized by Indians, and exchanging them for horses, which in turn they sell in the settlements." P–14, D–218 at p. 9. He noted that tribal women would collect and dry food abundant in the Klickitat region, such as berries, and trade the same for foodstuffs unavailable in their territory. *Id.* at p. 10.

The Yakamas' system of trade and exchange was also religiously significant. Some items not readily available to the tribe, such as crabs and other types of shellfish, were of vital religious and ceremonial importance. Yallup testimony at p. 21. Obtaining an adequate supply of such indispensable goods without giving up those in need of constant replenishing was considered desirable in the Yakamas' religion, as well as economically beneficial to the tribe. Therefore, propitious trading was considered "the art of survival." *Id.* at p. 22; Walker testimony at p. 17.

Yakamas also traveled for hunting, gathering, fishing, grazing, recreational, political, and kinship purposes. Walker testimony at p. 20; P–14, D–218; P–15, D–344. For example, the Yakamas, along with other Plateau tribes such as the Nez Perce, traveled to the buffalo grounds in the eastern plains to hunt with the Flathead tribes during the late spring and summer months. P–15, D–344 at p. 5; Yallup testimony at p. 18. These hunting trips would be very organized and include goods for trade in the area. Walker testimony at p. 21. Additionally, the Yakamas communicated continually with Puget Sound tribes during the summer months by travel through the mountain passes.

Further, within the plateau area itself, travel was required to obtain various foodstuffs and game. *Id.* at p. 17. Typically, after planting potatoes in late spring, the Yakamas would leave for the mountains to dig for roots. P–15, D–344 at p. 5. Some tribal members would then travel to the rivers to fish for spring salmon, while others would remain in the mountains throughout the berry season. *Id.* In the autumn, the Yakamas would gather their store of berries and return to the rivers for fall fishing. *Id.* Shortly afterward, the buffalo hunters returned from the Plains, where they had remained since the previous fall or spring. P–14, D–218; P–15, D–344 at p. 5. At the first snow, Yakama hunters would return to the mountains for deer, elk, and other game. Finally, during the harsh winter months, the Yakamas were driven to the straits to survive the weather. P–14, D–218 at p. 15.

Travel was essential with respect to the Yakamas' custom of taking fish. Tribal members would travel to the Columbia River to intercept the early runs of salmon, then follow the runs as they moved through Yakama territory and beyond. Yallup testimony at p. 11; Walker testimony at p. 17. In furtherance of their fishing practices, the Yakamas maintained fisheries at The Dalles and other locations on the Columbia River. P–14, D–218 at p. 13. Therefore, travel to these areas was absolutely necessary for the Yakamas to maintain their fishing practices.

Travel for fishing purposes is particularly significant when considering how fish, notably salmon, are woven into the fabric of Yakama life. Fishing was and remains of paramount importance to the tribe. It has been estimated that as much as fifty percent of the Yakamas' diet depended on fish and constituted a primary staple. Walker testimony at p. 19. The Yakamas also used salmon for religious and ceremonial practices in which every part of the fish played a role. Further, several species of salmon were used for various medicinal purposes. Yallup testimony at pp. 10–12. Finally, as described above, fish was especially valuable in trading with other tribes for goods and services. Salmon was particularly prized by tribes such as the Crow and Flathead who did not have access to salmon in their territories. *Id.* at pp. 10–11; Walker testimony at pp. 19–20. Thus, the ability to take fish, which depended on the ability to travel, played a dominant role in Yakama life.

Additionally, travel was important to maintain cultural ties with families. The usual custom of the Yakama men was to seek wives in adjoining tribes, resulting in much intermarriage with tribes on the western side of the Cascades, as well as with tribes to the north. P–14, D–218 at pp. 17–18. Travel enabled the children of such unions to learn the culture of both sides of their families. Yallup testimony at p. 24. In this way, the culture of each band was maintained through the generations. *Id.*

The record as a whole unquestionably depicts a tribal culture whose manner of existence was ultimately dependent on the Yakamas' ability to travel. Significantly, Stevens

knew of the Yakamas' reliance on travel when entering into Treaty negotiations. Walker testimony at p. 22; P–14, D–218; P–15, D–344. For example, George Gibbs had reported that the tribes "require the liberty of motion for the purpose of seeking, in their proper season, roots, berries, and fish, where those articles can be found, and of grazing their horses and cattle at large; but they do not need the exclusive use of any considerable districts." P–14, D–218 at p. 29. Stevens' knowledge of the importance of travel is further illustrated by the promises given to the Yakamas during the Treaty negotiations regarding their ability to travel off-reservation. *See, e.g.,* P–2 at p. 67 ("You will be allowed to go to the usual fishing places and fish in common with the whites, and to get roots and berries and to kill game on land not occupied by the whites.").

### 2. Pre–Treaty Contacts

The Yakamas' contacts with whites began many years prior to Treaty, resulting in native use of horses and firearms. Richards testimony at p. 9. After the Lewis and Clark expedition in the early 1800s, the Yakamas experienced increased contact with explorers and fur traders, predominantly those with the Hudson's Bay Company. *Id.* at pp. 12–13; P–14, D–218 at p. 11. Additionally, the Yakamas had frequent interaction with Catholic priests who resided at the Ahtanum Mission in the Yakima Valley. Richards testimony at p. 15; P–14, D–218 at p. 13. The first white settlers in the Northwest arrived in 1840s in Oregon's Willamette Valley. Few settlers were present in the Yakima Valley in 1855, although the lands west of the Cascade Mountains were rapidly becoming settled by whites. Richards testimony at p. 16. Thus, until the early 1850s, the Yakamas' contact with whites was mostly limited to encounters with explorers, traders, and missionaries.

During the Treaty negotiations, Isaac Ingalls Stevens was the Territorial Governor of the Washington Territory and also served as Superintendent of Indian Affairs for Washington Territory. Richards testimony at p. 23. At the same time, Stevens was Chief Engineer of the Northern Division of the Pacific Railroad Surveys chartered by Congress to ascertain the most expedient transcontinental railroad route. *Id.* at p. 24; P–14; D–218.

Stevens was under tremendous pressure to quickly negotiate treaties with eastern Washington tribes, because lands occupied by those tribes were important in settling the Washington territory. United States policy at the time favored settlement of the Northwest by whites, and the government sought to avoid hostilities between whites and Indians. *See* D–204–214 (treaties between the United States and other tribes); D–216. The increased migration of settlers to the Washington Territory only intensified the necessity to free land for settlement. The Oregon Donation Act, passed by Congress in the 1850s, allowed settlers to take lands in areas that were still occupied by tribes but had not been ceded to the United States. D–215; D–216. The Act contributed to the pressure placed on Stevens to obtain title to Indian lands as emigrants were attempting to enter the Yakima Valley and take up settlements. Richards testimony at pp. 23–24.

Further, Stevens and other government officials envisioned the construction of wagon and military roads through Yakama lands to provide access to the settlements on the west side of the Cascades. D–216; D–334 (letter from Stevens to J. Patent Anderson, territorial marshal, advising him to work with prominent citizens in building road across Cascades over Naches Pass). Finally, as with other eastern Washington tribes, Stevens was prompted to extinguish Yakama title to land, or obtain a right of way through Yakama land, for the purpose of constructing a railroad route through the Cascade mountains to Puget Sound.[6] D–216. Accordingly,

---

**6.** In a report to the Senate Chairman of the Committee on Indian Affairs, the Commissioner of Indian Affairs stated that it was now favorable to enter into treaties with tribes:

With many of the tribes in Oregon and Washington Territories, it appears to be absolutely necessary to speedily conclude treaties for the extinguishment of their claim to the lands now or recently occupied by them.

The policy of the government has favored emigration to, and settlement within those territories, by citizens of the States; and, in consequence, they have been and are rapidly filling up with white settlers; yet the Indian tribes

the Yakamas were considered of great importance to Stevens and the United States "from their occupying the country traversed by the Military and emigrant trial from Walla Walla to Puget Sound." P–15, D–344 at p. 1.

Thus, obtaining Indian lands east of the Cascades became a central objective in Stevens' career. In his address to the first session of the Washington legislature, Stevens declared his aspiration to extinguish Indian title to land for the purpose of constructing roads and a railroad route through the Territory. D–291; Richards testimony at 24. Stevens surmised that if he attained the right to build a road through Washington Territory to Puget Sound, the Territory would likely receive more federal funds for additional road-building projects. D–334; Richards testimony at 24.[7] In pursuit of his goals, Stevens employed Captain George McClellan, Andrew Bolon, and James Doty, who each visited the Yakamas prior to Treaty negotiations. Richards testimony at p. 46.

McClellan was a commanding officer of the Western Division of the Pacific Railroad Exploration. P–14, D–218. In 1853, McClellan was sent to investigate possible routes for a wagon trail and railroad through the Cascades. P–14, D–218; P–17, D–335; P–15, D–344 at p. 22; Richards testimony at 46. To that end, McClellan conversed with several members of Eastern Washington tribes. Although McClellan did not consider it necessary to enter into formal talks with many of

the tribes, the situation with the Yakamas was viewed differently: "Their country was to become a thoroughfare for the whites, and it was very important that a proper impression should be made, and a friendly understanding established." P–14, D–218 at p. 16.

During his visit, McClellan met with Yakama Chief Kamiakin and "explained to him the general nature of the American government, as far as was necessary for him to understand, and the rank that Governor Stevens ... would hold in the country." *Id.* McClellan advised Kamiakin of the government's intention to build a wagon road and railroad across the mountains and informed Kamiakin that many whites would pass through Yakama country. *Id.* McClellan further expressed the wish that Kamiakin would assist the government in that endeavor, explaining that the travel of whites through Yakama country would greatly benefit Yakama trading enterprises. *Id.*; P–17, D–335 at p. 4. After spending several weeks with the Yakamas, McClellan departed and informed Yakama leaders that Stevens would be coming in the next year or so to discuss a treaty with the Yakamas. Richards testimony at p. 48.

Andrew J. Bolon met with Yakama leaders approximately one year later. Bolon was appointed by Stevens as an Indian agent for Eastern Washington. Richards testimony at p. 49. The purpose of his visit was to prepare eastern Washington tribes for a treaty

still claim title to the lands on which the whites have located, and which they are now cultivating. The jealously which has resulted from this state of things has naturally led to repeated hostilities, resulting in severe suffering, and, in some instances, the murder of the white settlers, and in hindering the general growth and prosperity of the civil communities of these Territories.

Unless something more effectual and definite be done speedily, it is probable that hostilities will be resumed by the Indians in Oregon on a more extended scale, and engaging a larger and better organized body of Indians than the settlers there have heretofore contended with.

The increase of the annual overland emigration to the Pacific coast, and the desirableness of increased facilities for its speedy and safe transit, have brought to the notice of the public various projects for the construction of railroads from various points on the western fron-

tiers of the States to different points on the Pacific, and the prospect that one or more railroads may eventually be constructed, renders it peculiarly proper that all hostile Indian tribes or bands along such routes be permanently pacified.

D–216 at pp. 1–2.

7. Apparently, Stevens was also motivated by the natural resources available in Eastern Washington. In a letter a year before the Treaty negotiations, Stevens remarked, "There is much valuable land and an inexhaustible supply of timber east of the Cascades. I consider its speedy settlement so desirable that all impediments should be removed...." Darrell Scott, Editor, *A True Copy of the Record of the Official Proceedings at the Council in the Walla Walla Valley 1855*, pp. 7–8 (Official Proceedings). Stevens also learned, prior to the Treaty negotiations, that gold had been discovered in Eastern Washington. *Id.*

conference in more specific terms than McClellan had. *Id.* at p. 50. Accordingly, Bolon indicated the intent of the government to pursue the "occupation of [Indian] territory by the whites." P–15, D–344 at p. 2.

In his report to Governor Stevens, Bolon noted that the Yakamas were "a proud and spirited race," different than coastal tribes, in that they were "ready to resist injustice or oppression." P–15, D–344 at p. 5. In fact, the distrust by one Yakama Chief was so great that he would not accept gifts from Bolon for fear it would create a lien on Yakama lands. *Id.* at p. 1; *see also* P–14, D–218 at p. 16; P–17, D–335. This distrust apparently resulted from occurrences in Oregon where gifts were given to Indians upon negotiations of treaties subsequently repudiated by the whites even though the lands remained in the possession of settlers. P–15, D–344 at pp. 1–3. Therefore, according to Bolon, "It will be of greatest importance that any treaties made with [the Yakamas] be not rejected or their engagements left unfulfilled" by the government. *Id.* at pp. 5–6; Richards testimony at p. 51.

In August 1854, Stevens and General Palmer, Superintendent of Indian Affairs for the Oregon Territory, were instructed to

> enter at once upon [treaty] negotiations, commencing with those tribes in the vicinity of the settlements of the whites, and having for a principal aim the extinguishment of the Indian claim to the lands, and the concentration of all the tribes and fragments of tribes on a few reserves of limited extent, naturally suited to the requirements of the Indians, and located, as far as practicable, so as not to interfere with the settlement of the Territories respectfully. They [a]re admonished of the importance, also, of adopting but few stipulations to be fulfilled on each behalf, which should be simple and well understood by the Indians. . . .

D–220; *see also* D–343.

Subsequently, James Doty visited the Yakamas in early April of 1855, several weeks before the commencement of treaty negotia-

tions. Doty accompanied Stevens on the railroad surveys and assisted Stevens in prior treaty negotiations. Richards testimony at 53. Doty, along with Bolon, attempted to explain the treaty process and the major tenets of a treaty. *Id.* Doty described the major provisions of the treaty as follows: the government would purchase all of the Indian country with some lands reserved to the Yakamas upon which no white man could enter without consent of the tribe or their Indian Agent; Indian horses and cattle would be allowed to graze outside of reservation on lands unclaimed by settlers; the government would provide buildings, a schoolhouse, a blacksmith, a carpenter shop, and mills; and the Yakamas "would have the right of traveling through the country upon lawful business, fishing at accustomed places in common with the whites, and going to the mountains for berries, always provided that they were to remain upon their Reservation when required." P–24, D–348 at pp. 18–19.

Due to the ever-increasing presence of whites, the Yakamas thought that a treaty was inevitable and wanted to "strike the best deal possible." Walker testimony at p. 37.

It was within this context that treaty negotiations occurred between members of the Yakamas and Governor Stevens on behalf of the United States government.

## C. Treaty Negotiations at the Walla Walla Council

The parties agree that the Treaty minutes accurately replicate what Stevens and General Joel Palmer told the Yakamas at the Treaty negotiations. See P–2.[8] The parties further agree that Article III accurately reflects the statements made during the negotiations as reported in the Treaty minutes. P–1; *see,* Dr. Richards testimony at p. 126. Therefore, no issue regarding the substance of what was communicated to the Yakamas by Stevens and his agents is raised.

The Treaty proceedings, commonly known as the Walla Walla Council (Council), commenced in the Walla Walla Valley in south-

---

**8.** Although the parties have submitted the Treaty and the official treaty proceedings as joint exhibits and as plaintiffs' exhibits, the court refers to

the Treaty as P–1 and the minutes of the Treaty proceedings as P–2 for simplification.

eastern Washington Territory. On May 24, 1855, tribes began arriving at the Treaty grounds. The parties to the Treaty first met on May 28, 1855, to make preliminary arrangements, and the Council formally opened on the afternoon of May 29, 1855. P–2 at p. 29. In attendance of behalf of the United States were Governor Stevens, General Palmer, James Doty, and other Treaty officers. *Id.* Additionally, approximately fifty citizens were present, bringing the total of non-Indians to approximately sixty. *Id.* Chiefs from the Yakama, Nez Perce, Walla Walla, Cayuse, and Umatilla tribes attended, in addition to approximately 1800 tribal members. *Id.* The principle leaders speaking on behalf of the Yakamas were Kamiakin, Owhi, and Skloom. *Id.* at p. 34.

Several interpreters were also present during the Council to translate for the parties. English words were translated into Chinook jargon for the tribes, although that was not the primary language of any tribe. Walker testimony at pp. 38–40. The tribes agreed to the selection of the interpreters, with a Cayuse chief remarking: "We know of no others whom we would wish. There may be some words hard for them to make us understand, but we think the arrangement good as it is." P–2 at p. 35.

Stevens began the formal negotiations by expressing the government's desire to better the lifestyle of tribal members and assure peace:

We told the Great Father, these men have farms. The Great Father said I want them to have more and larger farms. I told him you had cattle and horses. He answered that he wanted your horses and cattle to increase. I told him some of your grown people could read and write. He answered, I want all the grown people and all the children to learn to read and write. I told him that some of you were handy at trades. He answered that he desired to give all who choose the means to learn these trades.

*Id.* at p. 39.

Further, Stevens declared a resolution to protect the Indians from "bad white men" if the tribes agreed to live within designated reservations, explaining that "when the white

man and the red man lived together in the same ground the white man got the advantage and the red man passed away." *Id.* at p. 40. Consequently, "[o]n each tract [of land] we want an agent to live who shall be your brother and who shall protect you from bad white men." *Id.* at p. 41. Thus, it was communicated to the tribes that whites and Indians should not occupy the same territory and that the tribes would be protected from unlawful white men by living on the reservations. As Palmer stated:

Who can say what is mine and what is yours? The white man will come to enjoy those blessing with you. What shall we do to protect you and preserve peace? There are but few whites here now. There will be many. Let us, like wise men, act so as to prevent trouble.

\* \* \*

We did not come here to scare you or to drive you away, but we came here to talk to you like men, and to make such arrangement as to preserve peace and protect you. Our agents have tried to protect you in all your rights. But I am fearful they will not always be able to do so if you continue to live in this scattered condition.

P–2 at pp. 52–53; *see also Id.* at p. 49 ("All experience we have had with Indians these three hundred and sixty years shows us that the white man and the red man cannot live happily together.").

As further incentive to sign the Treaty, Stevens guaranteed the tribes that, in exchange for the tribes' acquiescence in living on a specific tract of land, each reservation would include a blacksmith, a carpenter shop, a saw mill, a grist mill, along with an Indian agent to protect them from "bad white men." *Id.* at p. 41. Palmer guaranteed that "[i]f we make a treaty with you and our Great Chief and his council approves it, *you can rely on all its provisions being carried out strictly.*" P–2 at p. 55 (emphasis added).

Contrary to defendants' assertion that the Yakamas' right to travel was not a component of treaty negotiations, the subject was repeatedly broached, most often by Stevens or Palmer. For example, on May 31, 1855, Stevens told the tribal members present:

We do not want you to agree not to get roots and berries and not to go off to the buffalo. We want you to have your roots and to get your berries, and to kill your game. We want you if you wish to mount your horses and go to the Buffalo plains, and we want more; we want you to have peace there.

*Id.* at p. 44. Thus, as explained to the Yakamas, entering into the Treaty would not infringe upon or hinder their tribal practices. Rather, the Treaty was presented as a means to preserve Yakama customs and prevent further encroachment by white settlers, while at the same time providing tribes with modern accoutrements to enhance their standards of living and fortify their resources.

Stevens also explained the reservation boundaries that the government intended to create, including those of the Yakama reservation. As justification for selecting the reservations sites, Stevens related:

There is plenty of Salmon on these Reservations, there are roots and berries, there is also some game. You will be near the great road and can take your horses and your cattle down the river and to the Sound to market. Though near to the great roads, you are a little off from them, and you will not be liable to be troubled by travelers passing through.

*Id.* at p. 64. Stevens further explained to tribal members that:

You will be allowed to pasture you[r] animals on land not claimed or occupied by settlers, white men. *You will be allowed to go on the roads to take your things to market, your horses and cattle.* You will be allowed to go to the usual fishing places and fish in common with the whites, and to get roots and berries and to kill game on land not occupied by the whites. *All that outside the reservation.*

*Id.* at p. 67 (emphasis added).

With regard to the Yakama Reservation specifically, "[tribal members] shall have the same liberties outside the reservation to pasture animals on land not occupied by whites, to kill game, to get berries and *to go on the roads to market.*" P–2 at p. 69 (emphasis added). Neither Stevens nor his agents mentioned any sort of restriction on these

rights, other than the condition that the United States government be allowed to construct wagon roads and a railroad route through the reservation. As General Palmer asserted:

My brother has stated that you will be permitted to travel the roads outside the reservation. We have some kind of roads which perhaps you have never seen. We may wish to make one of the roads from the settlements east of the mountain to our settlements here. They may desire to run that road through your reservation. If we desire to do so we wish that privilege. That kind of road we call a rail road.... Now if our chief desires to construct such a road through your country, we want you to agree that he shall have the privilege. You would have the benefit of it as well as the other people.

\*     \*     \*     \*     \*     \*

Now as we give you the privilege of traveling over roads, we want the privilege of making and traveling roads through your country, but whatever roads we make through your country will not be for your injury.

*Id.* at pp. 70–71.

Nearing the end of treaty negotiations, Stevens told the tribes: "You will not be called according to the paper to move on the reservation for two or three years. *Then is secured to you your right to fish, to get roots and berries and to kill game.*" *Id.* at p. 98 (emphasis added). Finally, when trying to convince Nez Perce Chief Looking Glass and others to agree to the Treaty provisions, Stevens reassured them that in this reservation settlers cannot go, that [each tribal member] can graze his cattle outside of the reservation on lands not claimed by settlers, that he can catch fish at any of the fishing stations, that he can kill game and can to the buffalo *when he pleases,* that he can get roots and berries on any of the lands not occupied by settlers.

*Id.* at p. 102 (emphasis added).

Although Chief Kamiakin expressed some reluctance to the Treaty, he ultimately agreed based on Stevens' and Palmer's rep-

resentations, declaring: "I have been afraid of the white man. Their doings are different from ours. Your chiefs are good. Perhaps you have spoken straight, that your children will do what is right. Let them do as they have promised." P–2 at p. 59.[9]

Thus, in reliance on the promises given by Stevens and Palmer, the Yakamas agreed to the Treaty provisions in good faith on June 9, 1855.

### D. Actions of the Parties Since Treaty

The Ninth Circuit also instructed this court to examine the actions of the parties since the signing of the Treaty to determine what the parties intended in Article III, paragraph 1.

It is well-documented that the Yakamas' traveled extensively prior to the Treaty negotiations. See supra pp. 1238–1239. Further, according to reports of the Yakama Indian Agency, Yakama Indians continued to travel off-reservation years after the treaty was negotiated and ratified. See, e.g., D–223 (unless government can "induce them to give up rambling habits, choose a fixed habitation, and become tillers of the ground," Yakamas will not prosper). For example, the Yakamas traveled to hop fields to pick hops or into the mountains for root and berry-gathering during the summer months and would not return until the late fall. P–31, D–241 at p. 386. Yakamas also continued to travel off-reservation for hunting purposes. P–30, D–237; see also P–44, D–250.

Most importantly, Yakamas continued to travel off-reservation to fish: "Each year several bands of Indian on the reserve, and also non-reservation Indians, travel to the salmon fisheries on the Columbia River, where they have been accustomed to obtain a food supply of fish to last them all winter." P–28, D–235 at p. 291; see also P–26, D–224 at p. 581; P–47 (noting large numbers of Yakamas engage in salmon fishing on the Columbia, drying large quantities of fish to be used as winter food); P–26, D–224; D–520.

With respect to the precise right at issue in this litigation, little evidence is presented regarding the Yakamas' understanding of the claimed right to be free from state registration requirements and permitting and licensing fees when hauling tribal goods to market. However, the court reviews the actions it considers relevant.

Yakamas traveled Washington state's public roads and highways without charge until the state began enacting statutes which imposed licensing and permitting fees. Apparently, 128 automobile licenses were issued to Indian-owned automobiles in 1932. P–47, D–451. However, it was estimated that on-reservation Indians owned approximately 500 automobiles at that time. Id. Currently, the Yakama Nation requires personal vehicles to be licensed according to Washington state law. D–280 (Yakama Nation Law and Order Code, section 50.01.01), cf. D–277 (tribal member stating that he had never purchased vehicle without paying for license).

Evidence suggests that the Yakamas voiced objections to roads built through the reservation without tribal approval. P–32; Yallup testimony at pp. 54–55. Further, the record reveals that the Yakamas objected to state-proposed financing and construction of a highway through the Yakama Indian Reservation in 1932. One proposal was to make gross expenditures a reimbursable charge against the Yakama Nation. However, "[t]he Yakima Indians, while anxious for the construction to proceed, vehemently protest any appropriation being made that would result in a reimbursable charge against the present or future assets of the tribe." P–45, D–450.

Finally, individual plaintiffs involved in this case have brought suit previously in federal and state court challenging the state's imposition of licensing and permitting fees for their logging trucks. See P–51 (Findings of Fact and Conclusion of Law in Abraham Beebe, et al., v. Don Lewis, No. C–81–657–RJM (E.D.Wash.1982)); P–52 (Findings of Fact and Conclusions of Law in Order Dis-

---

**9.** Chief Owhi expressed anguish over the decision, evidencing the seriousness with which the Yakamas considered the treaty negotiations: "What shall I do? Shall I give the lands that are a part of my body and leave myself poor and destitute? Shall I say I will give you my lands? I cannot say." P–2 at p. 82.

missing Charges as a Matter of Law in *State v. Cree,* No. TI87–4863299 (Dist.Ct.Wash. 1988) and *State v. Dalton,* No. TI87–4836800 (Dist.Ct.Wash.1988)); and P–53 (Memorandum Opinion in *State v. Tiin–Ma Logging Co. and Joseph Yallup,* Nos. 5589349, 5589350, 5597156 (1989)).

In each case, a court found that Washington truck licensing and permitting fees violated plaintiffs' Treaty rights and ruled that the Treaty prohibited the state from imposing such fees against tribal members. Yet, the state continued to impose those fees until this court issued preliminary injunctions in the instant litigation.

Having reviewed the relevant factual circumstances, the court proceeds to its discussion of plaintiffs' claims.

### TREATY CLAIM

Plaintiffs argue that the Treaty language, along with the promises made to the Yakamas at the Walla Walla Council, unambiguously reserves to the Yakamas the right to travel the public highways without restriction, and therefore precludes the state from imposing registration requirements and licensing and permitting fees on Indian-owned trucks hauling tribal goods to market.

Defendants counter that the parties to the Treaty did not intend any such exemption from state fees. Defendants first argue that neither party to the Treaty expressed an intention to preserve the Yakamas' traditional system of trade and exchange, and therefore no right to travel without restriction was reserved by the Treaty. Further, defendants claim that even if such a right was retained by the Treaty, that right does not extend to plaintiffs' logging trucks, because logging is a modern "Euroamerican" enterprise. Defendants maintain that the Yakamas' actions before and after the Walla Walla Council exhibit such an understanding on the part of the tribe. Finally, defendants contend that even if the Yakamas retained a right to travel the public highways free of restriction, the truck licensing and permitting fees do not violate the Treaty because

10. Actually, defendants' do not explicitly make this argument; however, the court infers this

they are necessary to preserve the public highways. *See* State Defendants' Trial Brief at 10.[10]

### A. The Meaning of "In Common With"

Article III, paragraph 1, of the Treaty With the Yakamas secures to the Yakamas "the right of way, with free access from the [reservation] to the nearest public highway" and "the right, in common with the citizens of the United States, to travel upon all public highways." Although the Treaty first references the right of free access from the reservation to the nearest public highway, the court finds most critical the language securing to the Yakamas the right to travel the public highways "in common with" citizens of the territory.

Notably, the Treaty does not include a restriction on the Yakamas' right to travel; rather, it *secures* a right to travel. However, the Treaty language does not define the scope of the right to travel or the precise meaning of "in common with." Nor was a precise interpretation given for the term "in common with" during the Walla Walla Council. Walker testimony at p. 24. The only reference to such commonly held rights is Palmer's discussion of the railroad that the federal government wished to build through the reservation. In explaining the railroad, Palmer stated: "You would have the benefit of it as well as the other people." P–2 at 70. Finally, no term in Chinook jargon is the equivalent of this phrase. *See* P–55; P–56. Neither party presented evidence suggesting that "in common with" was ever explained to the Yakamas.

The evidence, or lack thereof, submitted in this case with respect to the term "in common with" comports with the findings in *United States v. Washington:*

The treaty language "in common with all citizens of the Territory" was probably introduced by George Gibbs, who was a lawyer and advisor to Governor Stevens. There is no discussion of the phrase in the minutes of the treaty councils, in the in-

contention from language in their brief.

structions to Stevens, or to the treaty negotiators, or in Stevens' letters of transmittal of the treaties. *There appears to be no phrase in the Chinook jargon that would interpret the term in any exact legal sense.*

384 F.Supp. 312, 356 (W.D.Wash.1974), *aff'd,* 520 F.2d 676 (9th Cir.1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976) (citations omitted; emphasis added). As this observation indicates and the record reflects, the Yakamas had, at best, a rudimentary understanding of the phrase "in common with." In light of their limited contact with whites prior to the Treaty negotiations, it is difficult to imagine a sophistication on the part of the Yakamas that would enable them to discern a precise legal meaning of this term.

Notwithstanding the Yakamas' lack of understanding of this language in a legal sense, the term "in common with" was presented as if understood and obvious to all present. Walker testimony at 24. In the Yakama language, those words would mean or suggest customary or public use, or open to everyone, such as open to general use without restriction. *Id.* at p. 30. Mr. Yallup testified that Skloom and Kamiakin, as well as other Yakama members, understood that their right to travel was not subject to any restrictions. Yallup testimony at p. 25. Therefore, as the Yakamas understood this term, no impediment was placed on their customary practice of travel or their right to travel to market. *Id.*

In looking to the circumstances surrounding the Treaty, it seems clear that the Yakamas understood the term "in common with" as common usage among Indians and non-Indians with no restriction placed upon tribal members. Contrary to defendants' assertions, no evidence suggests that the term "in common with" placed Indians in the same category as non-Indians with respect to any tax or fee the latter must bear with respect to public roads. Instead, the term was understood by the Yakamas and Stevens alike to mean that the Indians retained the *right* to travel the public roads, on and off-reservation, and that *right* would be exercised "in common with" non-Indians. In other words,

both Indians and non-Indians would use the public roads simultaneously. The promises made and the Walla Walla Council, and the historical context in which they were given, supports the court's conclusion.

First, it is obvious that Stevens and his agents understood the importance of off-reservation travel to the Yakamas. Indeed, this provision was part of the "big sell": the Yakamas could maintain their traditional way of life, with improvements courtesy of the United States government, but they must sell most of their land and live within the confines of the reservation where they would be protected from "bad" white men. In return, Stevens guaranteed that the Yakamas "shall have the same liberties outside the reservation to pasture animals on land not occupied by whites, to kill game, to get berries and to go on the roads to market." P–2 at p. 69. This statement unequivocally secured the Yakamas' right to travel off-reservation in order to maintain their customs of hunting, gathering, and trade. More importantly, in entering the Treaty, the Yakamas relied on Stevens' and Palmer' promises that they would be able to maintain their cultural and subsistence practices which centered on their ability to travel.

Furthermore, Stevens and Palmer represented that the Treaty provisions were beneficial to the Yakamas. Stevens asserted that the Yakamas could live in peace and enhance their way of life if the they agreed to live within the designated reservation. *Id.* at pp. 39–41. Palmer promised that the government would protect the Yakamas and their rights if they signed the Treaty and moved onto the reservation. *Id.* at pp. 52–53. Finally, Stevens and Palmer explicitly guaranteed that the Yakamas would retain the right to travel outside of the reservation in pursuit of their traditional practices of fishing, hunting, and gathering, as well as taking goods to market.

In exchange for the retention of the right to travel outside of the reservation, Stevens and Palmer explained that the tribes must agree to allow roads, including railroads, to be constructed within the reservation boundaries. These were the terms of the bargain; no reference is made to other conditions such

as payment for or maintenance of public roads, either on or off-reservation. Rather, the accessibility of the public roads was described as an advantage for the Yakamas, without any mention of possible disadvantages, such as paying for or maintaining public roads. *See, e.g.,* P–2 at pp. 64, 70.

No assertion by Stevens at the Treaty Council contained any language that the Yakamas would interpret as a restriction of their right to travel. *See supra* pp. 1243–1244. Likewise, neither the Treaty language itself nor statements made during the Treaty negotiations suggested that "in common with" meant that Indians would be subject to travel restrictions applicable to non-Indians. Thus, the Yakamas would have naturally understood that they would be able to travel the public highways without restriction.

Moreover, when viewed in historical context, it is unlikely that Stevens would have intended to place restrictions on the Yakamas' right to travel. As explained above, Stevens' primary goal was to secure vast amounts of land and therefore reach an agreement with eastern Washington tribes as quickly as possible. Additionally, Stevens was well aware of the Yakamas' far-ranging patterns of travel and the importance of travel to Yakama culture. Stevens also knew that the Yakamas, along with other tribes, had expressed reluctance in entering a Treaty with Stevens and the United States government. *See* P–14, D–218; P–15, D–344; P–17, D–335.[11]

Under such circumstances, any indication by Stevens to restrict the tribes' off-reservation travel rights would have been met with hostility from Yakama leaders and the other 1800 tribal members in attendance at the Walla Walla Council. Therefore, in this context of the Treaty negotiations—the pressure placed on Stevens to conclude a treaty with the Yakamas, and the importance of the land held by the Yakamas, both for settlement and transportation purposes—it is inconceivable that Stevens would have raised an issue or intended a condition that might have derailed the negotiation process.

■ Finally, pursuant to the canons of construction, Stevens' intentions are irrelevant unless they were clearly communicated to and understood by the Yakamas. *See, e.g., Fishing Vessel,* 443 U.S. at 676, 99 S.Ct. at 3067 (treaties must be construed as Indians would have naturally understood terms). No evidence suggests that Stevens communicated an intent to restrict the Yakamas' right to travel, such as demanding payment or fees for the construction of public roads. Hence, the language of the Treaty, when viewed in historical context as the Yakamas would have understood it, unambiguously reserves to the Yakamas the right to travel the public highways without restriction for purposes of hauling goods to market.

A specific colloquy between the court and Dr. Walker best exemplifies the Yakamas' understanding of the Treaty and their right to engage in off-reservation travel. During trial, the court propounded the following hypothetical:

> Assume for a moment that [Stevens] had suggested to these people banded together down there ... suppose he said now, are you going to use the roads, you can have access to these roads, the public roads, and have the right to travel in and about some, but these roads cost money and we're going to expect you to make some contribution to their construction and maintenance, realizing that you don't have a lot of money in an ordinary sense of the word, you might have to contribute labor, manpower, that sort of thing, and instruct them and so on. What's your view of the effect that that would have had on the treaty negotiation?

Dr. Walker responded:

> It's my view that the tribe w[as] thinking at the time that well, we're giving up something on the order of 10 million acres. We are agreeing to go on the reservation. We are agreeing to let them build roads across the reservation. We are giving up the possibility of making warfare against our

---

**11.** Some Yakamas had expressed their distrust of whites during visits by McClellan and Bolon, and Chief Kamiakin had been warned by the local Catholic missionaries to proceed cautiously with the whites when entering treaty negotiations. P–14, D–218; P–15, D–344; P–2 at p. 199, n. 58.

neighbors. We are giving up lots of things.

For that, in turn, we are getting certain things, among which included a blacksmith, among which included the rights to use the roads and to continue fishing. My view of the reaction is that it would have been one of incredulity. *Having given up so much already, why should we also be required to give up yet more in order to retain a right that's already ours anyway?*

Walker testimony at p. 28–29 (emphasis added).

Indeed, why would the Yakamas knowingly agree to limit their right to travel, a right upon which their very survival relied? The record clearly demonstrates that the Yakamas understood the Treaty to preserve their right to travel, much as it secured their right to fish in usual and accustomed places. This right was secured unconditionally and without restriction. Accordingly, the Treaty precludes the state from imposing licensing and permitting fees and registration requirements indirectly exacting such fees on Indian-owned trucks when hauling tribal goods to market.

Even if the Treaty language was ambiguous, the court would reach the same result. Clearly, the Treaty does not unambiguously *restrict* the Yakamas' travel on the public highways; as discussed above, the phrase "in common with" was never explained to the Yakamas. Thus, if the language is deemed ambiguous—a finding which is difficult to make in light of the explicit promises made to the Yakamas at the Walla Walla Council— the court is bound to construe the phrase "in common with" in favor of the Yakamas. The reason for this liberal construction has been cogently explained by the Supreme Court:

> [T]hese treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, and any doubtful expressions in

them should be resolved in the Indians' favor.

*Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970) (internal citation omitted). Insofar as Article III, paragraph 1 of the Treaty is "ambiguous" or "doubtful," when resolved in favor of the Yakamas, the public highways clause reserves to the Yakamas the right to travel the public highways without restriction.

### B. Defendants' Arguments

Despite the unambiguous promises made to the Yakamas, defendants argue that the Yakamas "must" have known that "in common with" meant that tribal members stood on the same legal ground as non-Indians for the purposes of financing and maintaining public roads. Defendants cite several bases as support for this argument, each of which the court addresses in turn.

#### 1. Intent of Stevens and the United States

First, defendants specify the United States' assimilationist policy toward Indians, the mission of Stevens, and the intent of the United States and Stevens when entering the Treaty as evidence that the parties did not intend to reserve to the Yakamas a right to travel the public highways without restriction. Defendants claim that the primary purpose of the public highways clause was to allow government and public access to reservations for the purposes of building roads, railroads, and telegraph lines. Richards testimony at pp. 9–10. The secondary purpose, according to defendants, was to provide the Yakamas with equal access to roads which citizens enjoyed, with no less or more responsibilities. *Id.* at 10.

As support for their position, defendants profess that the major thrust of United States Indian policy was to place tribes onto reservations and assimilate them into white culture. The government would teach them art of "civilization" by providing modern goods, farm equipment, and appropriate training in skilled trades. Consequently, Indians would become proficient agriculturalists and prepare to become citizens of the

United States, after which time reservation land would be divided up in severalty and the excess sold. *Id.* at p. 9. Defendants contend that any intention on Stevens' part to guarantee the Yakamas the right to travel public roads without paying fees is not reflected by the Treaty minutes and would have been inconsistent with past federal policy relating to roads.

Defendants further argue that when Stevens and Palmer declared that the Yakamas would be free to take horses and cattle to market, they actually meant that the Yakamas would not be troubled by settlers when traveling on the roads. Defendants argue that the promises by Stevens and Palmer were consistent with the government's "assimilationist" policy, in that Indians, once "civilized" and raising horses and cattle, must have access to public roads in order to take their goods to markets in newly-established settlements. Richards testimony at pp. 59–60.

Similarly, defendants claim that the Treaty language securing the Yakamas' right to travel the public highways "in common with" citizens was intended to indicate that no restrictions—"aside from those that might be placed on citizens"—would be placed on Indians when they traveled from the reservation to the public highways, such as a fences built or tolls imposed by unscrupulous settlers. Richards testimony at p. 64–65. Therefore, defendants maintain that the public highways clause was simply intended as a means to prevent the exclusion of tribes and their members from the public highways by the government or non-Indians.

Defendants aver that Stevens carefully ensured that the Yakamas understood the intentions of the government in entering the Treaty, as well as the actual Treaty provisions. *Id.* at 10. Defendants further maintain that the Plateau Indians, such as the Yakamas, were familiar with the political organizations of non-Indians from contact with white traders, explorers, missionaries, and Stevens' agents, and therefore would have known of the government's Indian policy and its intentions when treating with Indians. Thus, defendants argue that the Yakamas understood "in common with" to mean "that

they, the Yakamas, could share equally with citizens the right to travel upon all, all public highways, and the right, unless its spelled out to the contrary, usually contains within that the concept that the right also has obligations." Richards testimony at p. 67. Accordingly, defendants contend that a fee for maintenance of public highways paid by Indians is not inconsistent with Stevens' intent at the treaty negotiations. *Id.* at p. 66; *see also* State Defendants' Trial Brief. The court finds defendants' contentions unsupported by the record and without merit.

First, the court is not convinced that Stevens or any other official of the United States intended to levy a tax against tribes for the use of public roads or to seek reimbursement for the maintenance of public roads. As explained above, Stevens was under tremendous pressure to conclude treaties with various Indian tribes to free land for settlement and, with respect to the Yakama Indians, to secure the right to build a railroad through Yakama land. Directions given to Stevens to accomplish this task were simple and straightforward: consolidate the bands of tribes on as few reservations as possible, spend as little money as possible, and pay annuities in the form of useful goods rather than money. D–220; D–343. No instructions were given to place Indians on "equal footing" with non-Indians.

Dr. Walker confirmed this limited scope of Stevens' mission. When asked whether the government intended to accomplish a transition of the Indians into Western culture by entering into the treaty, Dr. Walker replied:

> I think that that's going a lot farther than what Stevens understood his mission was in getting the treaty signed. I think his mission was to clear the land as much as possible for the incoming White settlers and to provide a safe haven for the tribes with the guarantees to the tribes necessary for them to maintain their continuing way of life.

Walker testimony at p. 49. Even though Stevens and Palmer may have articulated their belief that acculturation of the Yakamas would benefit the tribe, they expressed no intent that the Yakamas would be assimilated with non-Indians. As the record clearly re-

flects, Stevens and Palmer were well aware of the distrust with which the Yakamas viewed the white man; neither would have risked a suggestion that likely would have ended the negotiations.

Moreover, during the Walla Walla Council, Stevens made no mention of a broad federal policy to assimilate Indians with non-Indians or place them in the same category as non-Indians. Rather, an inducement for the tribes' acquiescence was the express promise that no white man would be allowed to enter reservations absent the tribal approval. Stevens explicitly stated that "the white man and the red man" cannot live together, and guaranteed the tribes an Indian agent to protect them from "bad white men." P–2 at p. 41.

As Dr. Richards testified, the primary purpose in all treaties with Indians was to "extinguish all Indian title and rights and acquire the land, to preserve peace between Indians and non-Indians, to provide for reservations and the civilizing process that were already prescribed and to do so through annuities." Richards testimony at p. 44. Given the fact that Stevens and his agents viewed the Yakamas and other tribes at the Council as unlearned savages, it is highly unlikely that he would have expected payment from them in order to maintain public highways. *See Official Proceedings* at p. 9. Stevens and Palmer stated as much when explaining the idea of a public highway to the Yakamas:

> Now as *we* give you the privilege of traveling over roads, *we* want the privilege of making and traveling roads through your country, but whatever roads *we make* through your country will not be for your injury.

P–2 at p. 71. Further, evidence in the records suggests that Stevens planned to obtain federal funding for such projects, eliminating any necessity for payment by the tribes. *See* D–334.

Defendants fail to recognize that even if Stevens and the United States intended to limit the Yakamas' right to travel, that intent was not expressed at the Treaty negotiations. Without question, Stevens was in the superior position to express such an intent and ensure that the Yakamas understood that

condition to be part of the bargain. In fact, the minutes of the Treaty negotiations reveal the expressed intentions to be quite the contrary. Stevens and Palmer repeatedly stated that it was *not* the intention of the United States to prevent tribes from hunting, fishing, gathering, or "going to the buffalo." P–2 at p. 44. Therefore, both parties to the treaty expressly intended that the Yakamas would retain their right to travel outside reservation boundaries, with no conditions attached, except to allow the government to build roads through the reservation.

When pressed by the court where defendants' gleaned their interpretation of the Yakamas' "responsibilities," Dr. Richards ultimately acknowledged that the Yakama Treaty, as with most treaties, does not address whether responsibilities attach with the right to use roads:

> [I]t's simply assumed that the tribes are going to be able to use those roads also. No one ever says differently or, that I know of, tries to prevent this, but also ... there's no one who says well ... the Indians are going to have special rights or privileges on these roads.

Richards testimony at pp. 69–70. Thus, Dr. Richards conceded that no treaty imposes any obligation upon tribes in conjunction with their rights to use the roads. Defendants' argument, therefore, rests upon unstated and unexplained assumptions.

Finally, the sophisticated understanding of the federal government's Indian policy that the Yakamas supposedly possessed is belied by the way in which Stevens and Palmer communicated their proposals at the Walla Walla Council. Stevens referred to the President as the "Great Chief," public roads as the "great roads," and utilized other simplistic language when assuring the tribes that the Treaty was for their benefit. The record further indicates that Chief Kamiakin was given only a brief and superficial description of the United States by Captain McClellan prior to Treaty negotiations. P–14, D–218 at p. 16.

In sum, defendants present no evidence suggesting how the Yakamas understood the Treaty language as represented by Stevens

and Palmer at the Walla Walla Council. Defendants merely point to the so-called intent of the federal government and Stevens when negotiating treaties. However, the court must construe the Treaty *as the Yakamas would have understood the language*. Defendants argument that the Indians understood the United States' underlying but unstated policy of assimilation and allocation is one the court views with incredulity, at best. Certainly, the Yakamas could not have been expected to understand scope and depth of United States Indian policy, such as it was, from their exposure to traders and missionaries or by spending a few weeks with Stevens and his agents.

It is true that the Treaty "nowhere explicitly states" that the Yakamas were to be free from state law or exempt from state taxes; however, that is not the relevant inquiry. *See McClanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973). "[A treaty] is not to be read as an ordinary contract agreed upon by parties dealing at arm's length with equal bargaining positions." *Id.* Rather, the scope of the Yakamas' right to travel must be divined according to the Yakamas' understanding of the Treaty language. Defendants offer nothing to convince the court that the Yakamas did not understand the unconditional promises given at the Walla Walla Council to reserve their right to travel.

### 2. Yakamas' Traditional System of Travel

Aside from arguing that federal policy and Stevens' intent foreclose the Yakamas from asserting a Treaty right to travel, defendants further claim that the parties did not intend to preserve the Yakamas' right to travel in order to maintain their traditional system of trade and exchange. Essentially, defendants assert that the parties did not intend to preserve the Yakamas' traditional travel customs because the Treaty language and negotiations reference public roads to be built by the government rather than Indian trails in existence at the time of the signing of the Treaty. Defendants further argue that the government intended to inhibit the Yakamas' traditional practices by placing them on a reservation. Therefore, defendants maintain that the Yakamas cannot claim a *secured* right to travel the public highways.

Defendants' distinction ignores the history which manifestly portrays the importance of travel to the Yakamas. As the record reflects, and defendants themselves admit, the Yakamas traveled extensively throughout the Northwest and beyond. *See supra* pp. 1238–1239 and exhibits cited therein. Their ability to travel provided the Yakamas with the means to exercise their aboriginal practices. Indeed, at the treaty negotiations, a primary concern of the Yakamas was that they retain freedom of movement to continue their traditional practices of hunting, gathering, trade, and, of course, fishing, whether they did so by Indian trails or by the public roads that the government intended to construct. Furthermore, Stevens unequivocally promised that the Yakamas retained the right to travel the public highways in furtherance of their traditional fishing, hunting, and gathering practices. P–2 at pp. 33–35.

The right to travel was particularly important with respect to the Yakamas' right to fish, which was explicitly secured by the Treaty. As the Yakamas maintained fisheries outside reservation boundaries, most notably on the Columbia River, it was necessary for the tribe to retain its right to travel in order to preserve its fishing practices. It is undisputed that retaining the right to take fish at their usual and accustomed places was vitally important to the Yakamas. Fishing permeated every aspect of their lives, from providing sustenance, to furnishing goods for trade, to maintaining cultural and religious customs. Yallup testimony at pp. 10–12. If the right to take fish was essential to the Yakamas' way of life, then undoubtedly the preservation of the right to travel to their "usual and accustomed" fishing sites, either by Indian trail or a public road, was equally important.

■ Thus, the Yakamas would have clearly understood that the Treaty secured their right to travel much like it reserved their right to take fish. This conclusion is supported by the Treaty minutes, which reveal that the Yakamas were made fully aware of the future construction of public roads, in-

cluding roads within and outside of reservation boundaries. P–2 at pp. 64, 67, 70. Through the public highways clause, the Yakamas preserved not only their aboriginal right to continue traveling off-reservation to obtain their means of subsistence, but a continuing right to do so on public highways if and when they should be built. Consequently, the court finds that the Yakamas reserved the right to travel in pursuit of traditional practices.

■ The court further notes that the Treaty itself "secures to" the Yakamas their right to travel the public highways. P–1. The plain meaning of this term constitutes a guarantee of a right already possessed; no specific reference in the Treaty indicates that the right to travel off-reservation was not continuing. Richards testimony at p. 114. In fact, subsequent to the Treaty, a substantial number of Yakamas continued to travel off-reservation for trading, hunting, gathering, and fishing practices. *Id.* at p. 113.[12] Additionally, the Treaty "further secures" the right to take fish and hunt, indicating an intent that the right to travel was secured in the same manner as the right to take fish.

Finally, although the parties dispute whether the Yakamas retained a right to travel to maintain their traditional methods of subsistence and trade, the court finds any distinction insignificant. Even if, as defendants vigorously argue, the Treaty was not intended to retain the Yakamas' right to travel to preserve their traditional system of trade and exchange, the Treaty was clearly intended to reserve the Yakamas' right to travel on the public highways to engage in *future* trading endeavors.

As the Treaty minutes reflect, Stevens unconditionally guaranteed that the Yakamas would have the right to take their horses and cattle and other goods to market. P–2 at pp. 64, 67. Defendants themselves maintain that the "market" communicated at the Treaty negotiations was limited to the white man's

market. Walker testimony at pp. 46–47. In this case, the Yakamas are engaging in an arguably modern economic enterprise, as the Yakamas did not own logging trucks in 1855 and do not take logs to traditional markets. *Id.* at p. 59. Thus, even under defendants' analysis, the treaty guarantees the right to travel upon public highways, without restriction, in pursuit of such endeavors.

### 3. Actions of the Yakamas

Next, defendants claim that the actions of the Yakamas, both pre- and post-Treaty, indicate that the Yakamas did not expect or intend to be free of fees imposed for use of the public highways.

### a. Pre–Treaty Actions

■ Defendants emphasize the fact that the Yakamas voluntarily branded their horses and cattle before and after the Treaty under Washington territorial law. D–297; Richards testimony at 84. Thus, defendants contend that the Yakamas could have anticipated the requirements for vehicle registration because territorial branding provisions parallel existing registration and licensing laws applicable to vehicles. However, branding was utilized solely for identification purposes rather than for regulation of horses as a means of transportation. More importantly, no fee was charged for branding nor was branding performed by the State. D–297. Therefore, the court does not consider relevant the Yakamas' use of branding for identification purposes.

Additionally, defendants attempt to equate public highways with toll roads and ferries in existence at the time of treaty negotiations, presumably to show that the Yakamas were familiar with paying a fee for use of non-Indians' transportation services. Defendants claim that use of toll ferries and toll roads by tribes evidence the Yakamas' understanding that they would be subject to fees for use of public roads under the terms of the Treaty.

---

12. According to Dr. Walker, the establishment of reservations did not disrupt the network of intra-tribal relations in existence prior to the treaty:

I think that's one interpretation, but that's not mine. I would disagree with that. I think that it helped protect and enhance the protection

that was available for the tribes against the incoming whites, while, at the same time, protecting their interrelationships which continued to be reflected in trade, marriage, religion, and other forms of interaction.

Walker testimony at p. 54.

However, at trial, plaintiffs elicited testimony that other Indian tribes, rather than the Yakamas, utilized toll ferries. Richards testimony at p. 118. Defendants concede that no specific document suggests that the Yakamas paid ferry tolls. *Id.* at p. 122. Defendants nevertheless maintain that the Yakamas "must" have utilized the ferries to cross the Columbia River while traveling to Oregon. However, as no evidence suggests that the Yakamas traveled by ferry, the court does not place great weight on this evidence.

With respect to toll roads, defendants presented evidence regarding Barlow Road in Oregon, constructed around Mount Hood to the Willamette Valley in 1846. This route was charted by the Oregon Legislature and became a toll road which required a fee for its use. Defendants maintain that the Yakamas "must have" known of Barlow Road because they traveled through the area "constantly" en route to the Willamette valley. Richards testimony at p. 122. However, defendants offered no evidence showing conclusively that the Yakamas used Barlow Road. Even so, Barlow Road was an exception, because toll roads were uncommon prior to the Treaty. *Id.* Certainly, the concept of tolls was inconsistent with non-Indians' own experiences.[13]

■ In any event, even if defendants presented convincing evidence that the Yakamas paid tolls for use of ferries and roads, such evidence would have little relevance to the issue of the parties' intent when entering the Treaty. The fact that the Yakamas may have paid a road or ferry toll does not lead to the conclusion that they agreed or intended to pay for the use of public roads after ceding away millions of acres of land. The Yakamas' payment of tolls, although unproven by defendants, was not in the context of Treaty negotiations. Therefore, the court finds the existence of toll roads or ferries irrelevant to its inquiry.

### b. Post–Treaty Actions

Next, defendants strenuously argue that the Yakamas' actions since the Treaty renounce the travel right that is now asserted. Defendants contend that until the 1980s, the Yakama Nation did not claim that the Treaty precluded vehicle license and registration fees. Defendants claim that the Yakamas' post-Treaty actions show that a Treaty right to be free from state vehicle licensing fees was never anticipated.

■ First, the court notes that it does not consider post-Treaty actions of the parties conclusive evidence of their intent when negotiating the Treaty absent unequivocal actions or statements by either party renouncing the Yakamas' right to travel. No caselaw suggests that the court interpret subsequent actions differently.

The cases cited by the Ninth Circuit in directing this court to examine subsequent actions—along with the Treaty language, history, and negotiations—clearly hold that subsequent actions cannot rewrite or expand a treaty beyond its clear terms "to remedy a claimed injustice or to achieve the *asserted understanding of the parties.*" *Choctaw Nation v. United States,* 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (emphasis added); *accord DeCoteau v. District County Court,* 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975); *see also Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 208 n. 17, 98 S.Ct. 1011, 1019–20, 1020 n. 17, 55 L.Ed.2d 209 (1978) (treaty with tribes "must be read in light of the common notion of the day and the assumptions of those who drafted them" in light of surrounding history and circumstances).

Defendants assert that a treaty cannot be written to remedy a perceived injustice against an Indian tribe; by the same token, this court cannot rewrite the Treaty to achieve what the state claims is the "asserted understanding of the parties." Because the court finds clear intent by the Yakamas and the government to retain the Yakamas' right

---

**13.** In his highly-acclaimed biography of Meriwether Lewis, Stephen Ambrose recounts how Captain Lewis credited Indians—whose descendants treated at the Walla Walla Council some 50 years later—with having saved the expedition by generously sharing their trails over the mountains which shielded the Pacific Northwest. The Indians even furnished guides, all without conditions or compensation. Stephen E. Ambrose, *Undaunted Courage* (1996).

to travel the public highways without restriction, subsequent actions of the parties cannot defeat the parties' intent. Even if the Yakamas' actions were relevant to this inquiry, the court finds no actions which belie their claim.

As the record reflects, the Yakamas continued to travel off-reservation many years after the Treaty for fishing and sustenance purposes. With respect to the precise facts at issue in this case, tribal members did not begin hauling goods, specifically tribal timber, off-reservation until the late 1970s. In fact, Kip Ramsey testified that he was the first Yakama logger to transport timber from the Yakama reservation to Boise Cascade in 1978. Likewise, Delbert Wheeler did not begin his logging business until 1987. P–54. Therefore, the fact that individual plaintiffs or the tribe did not bring suit until 1981 does not diminish their claimed travel right under the Treaty.

Moreover, many valid reasons explain why individuals, especially tribal members, do not attempt to assert their legal rights. These reasons include lack of resources and fear or misunderstanding of the legal system. Indeed, the facts of this particular case demonstrate why Yakama Nation tribal members might be reluctant to challenge perceived violations of their Treaty rights.

Mr. Ramsey testified that he believed the Yakamas had free access to all public roads under the Treaty.[14] Once Tiin–Ma and Wheeler Logging drivers began hauling timber off-reservation and received citations for failure to obtain the proper licenses and permits, they successfully brought suit in federal and state court. Nevertheless, the state continued to impose the challenged fees until this court ordered preliminary injunctions barring the imposition of the fees. Even then, state defendants continued to cite individual plaintiffs under a different statute. Therefore, it is easily understood why tribal members might consider it futile to pursue legal action.

The record illustrates that the Yakamas have often been reluctant to assert their claimed rights. According to a report from the Yakama Agency Superintendent to the Secretary of Interior dated August 22, 1906, Yakama Indians would be benefitted greatly from a Supreme Court decision and resulting decree defining the rights of Indians to fish on the Columbia River. However, the author of the report did not believe the tribe would take advantage of the Court's ruling:

[T]hese fisheries are such a great distance from the agency that it is difficult to enforce the decree, as the Indians are timid and are not inclined to assert their rights. They greatly fear the courts and the threats of the white people who like to have a monopoly of the fisheries and exclude the Indians altogether if they could.

P–31, D–241 at p. 387.

The same could easily hold true today where the state refuses to abide by court orders and continues to impose fees held to be unlawful. P–51; P–52; P–53. Accordingly, the court gives scant consideration to the subsequent actions of the Yakamas when the circumstances surrounding the Treaty clearly evince an intent to secure the Yakamas' right to travel the public highways.

### 4. Conservation

■ Defendants further contend that license fees allocated for preservation and maintenance purposes are permissible, notwithstanding the Yakamas' Treaty travel right. Because the revenue generated by the challenged fee requirements is deposited into the highway fund to help maintain the highways, defendants claim that Supreme Court caselaw does not proscribe the fees at issue. This court finds otherwise.

In *Tulee v. Washington,* 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), the appellant contended that the Washington statute which compelled him to obtain a license in order to fish for salmon violated the Treaty fishing right denoted in Article III, paragraph 2. *Id.* at 683, 62 S.Ct. at 863–64. In construing the Treaty fishing right, the Supreme Court reviewed prior decisions involving the language of Article III, the record reflecting the significance of tribal rights to hunt and fish, and the canons requiring liberal construction

---

**14.** Mr. Ramsey testified that his great-great-grandmother was Chief Owhi's sister.

of Treaty provisions in favor of the Indians. *Id.* at 684–85, 62 S.Ct. at 864–65. Using this methodology, the Court concluded:

> [W]hile the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging a fee of the kind in question here.
>
> \* \* \* \* \* \*
>
> The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not indispensable to the effectiveness of a state conservation program. Even though this method may be both convenient and, in its general impact, fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve.

*Id.* Thus, although the Court recognized that it was dealing with a nonexclusive right to fish, it still held that the imposition of licensing fees was an impermissible interference with the right provided to the Yakama Indian Nation by the Treaty.

In its Order Re: Subject Matter Jurisdiction, Intervention, this court noted that the fees at issue were predominantly revenue-raising rather than regulatory in nature. Ct. Rec. 133. Moreover, it is clear in this case that the regulatory purpose of these statutes—to discourage overweight travel on the highways—can be accomplished without the imposition of these fees. Indeed, plaintiffs concede that they will remain subject to the weight regulations imposed by the state which are designed to preserve the condition of the highways and will not challenge fines imposed for violations of those regulations. Further, nothing in the record suggests that these fees are "indispensable" to the preservation of the highways. The fees are not regulatory in themselves; rather they merely provide a source of revenue which the state *chooses* to devote a portion of towards the highway fund. The state could potentially obtain the revenue needed to build and maintain highways from different taxes. There-

fore, the fact that the state uses such fees to maintain highways does not overcome the Yakamas' retained travel right.

## TRIBAL SOVEREIGNTY CLAIM

Plaintiff Yakama Nation also claims that the State's registration requirements and licensing and permitting fees impermissibly infringe upon its tribal sovereignty right to regulate tribal members' exercise of the travel Treaty right. Plaintiffs argue that where a treaty reserve rights outside of reservation boundaries, the tribe has a sovereign right to regulate the exercise of that right by trial members. Defendants counter that plaintiffs fail to show that the State's off-reservation enforcement of state law substantially burdens the Yakama Nation's right to self-government.

■ Caselaw clearly establishes that tribal sovereignty, standing alone, does not preclude state jurisdiction over Indian conduct off-reservation. While Indian reservation lands and Indian income from on-reservation activities are generally not subject to the intrusion of state taxing authority, "[a]bsent express federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973); *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 144 n. 11, 100 S.Ct. 2578, 2584 n. 11, 65 L.Ed.2d 665 (1980); *see, e.g., Organized Village of Kake v. Egan,* 369 U.S. 60, 75–76, 82 S.Ct. 562, 571, 7 L.Ed.2d 573 (1962) ("[S]tate regulation of off-reservation fishing certainly does not impinge on treaty-protected reservation self-government.")

In *Settler v. Lameer,* 507 F.2d 231 (9th Cir.1974), the court held that the Yakama Nation possessed the authority to enforce its fishing regulations off-reservation by arresting and trying tribal violators upon their return to the reservation. *Id.* at 238. The court further held that the tribe could enforce its regulations by off-reservation arrest and seizure. *Id.* at 240. Although its holding was narrow, the court observed that the

"determination of when and how the [fishing] rights may be exercised is an 'internal affair' of the Tribe." *Id.* at 237; *see also United States v. Oregon,* 787 F.Supp. 1557, 1566 (D.Or.1992), *aff'd,* 29 F.3d 481 (9th Cir.1994). The court explained that regulation of treaty-preserved rights was one of the last "remnants of sovereignty" retained by the tribe, and the court found immaterial the fact that the exercise of the Treaty right was off-reservation. *Id.*

█ The Ninth Circuit's holding in *Settler* demonstrates that once the court identifies a Treaty right held by the Yakamas, the tribe should be accorded deference in determining how to exercise that right. Further, the doctrine of tribal sovereignty supports an interpretation which allows the Yakama Indian Nation to regulate non-members' exercise of the Article III travel right. Although this doctrine cannot serve as an independent claim, it still exists as a "backdrop" against which Indian treaties must be read. *McClanahan v. Arizona Tax Comm'n,* 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). Accordingly, the Yakama Nation's tribal sovereignty allows it to regulate and articulate the boundaries of the Treaty travel right.

█ Although the court interprets the Treaty travel provision as allowing plaintiffs to travel the highways without paying licensing or permitting fees, the court emphasizes that in exercising its *nonexclusive* right, plaintiffs must still comply with regulations imposed by the state which are designed to preserve and maintain the condition of the roads. *See Tulee,* 315 U.S. at 685, 62 S.Ct. at 864 (state could not impose licensing fees on Treaty right to fish but could still impose regulations designed to conserve the resource).

█ Finally, the court notes that compliance with state registration requirements, absent the licensing fee, does not impose upon the Yakama Nation's sovereign right to regulate the exercise of the right to travel. First, the Yakama Nation presented no evidence to support that the registration of trucks, in and of itself, infringes upon its tribal sovereignty. Second, the Yakama Nation requires all vehicles to be registered in accordance with Washington law. Therefore, plaintiffs have not shown any infringement upon their right to regulate the exercise of Treaty rights. This issue is likely rendered moot by the tribe's concession that it does not oppose registration for identification purposes. Nonetheless, Washington law requiring registration for Indian-owned trucks, absent the licensing and tonnage fees, does not infringe upon the Yakama Nation's tribal sovereignty.

## APPORTIONMENT CLAIM

Alternatively, plaintiffs argue that even if the Treaty did not retain the Yakamas' right to travel the public highways without restriction, the challenged fees are preempted by federal law because they are not pro-rated to account for actual off-reservation travel. *See Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), and *Moe v. Confederated Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Plaintiffs argue that any tax levied against on-reservation activities is preempted by federal law and the tribe's retained Treaty and tribal sovereignty rights. Defendants counter that the fees in question are not the type subject to preemption, and if so, are "practically" tailored to reflect actual off-reservation use of state roads.

The parties filed cross-claims for summary judgment prior to trial. They agree that no material issue of fact exists and the court may determine the issue solely as a matter of law. The court reserved ruling on this claim, finding it more appropriate to rule on all claims simultaneously.

### A. Facts

The parties do not dispute the facts relevant to this issue, and the court briefly recites them. All trucks involved in this case are operated on the highways at weights that require a monthly license. RCW § 46.16.070. A Yakama Indian who operates a truck both on and off-reservation pays the same monthly license fee regardless of the number of miles driven outside reservation boundaries. The fee is the same for non-

Indians and Indians. The owner and operator of the truck are jointly responsible for proper licensing. Without proper licensing, a truck cannot obtain registration under RCW 46.16.010. Lack of proper registration is a misdemeanor under state law. *Id.*

Additionally, temporary tonnage permits are available for trucks weighing up to 80,000 pounds. RCW § 46.44.095. The permits are issued per day, with a five-day minimum. For logging trucks exceeding certain weights, annual log tolerance permits are also required. RCW § 46.44.047. A Yakama Indian who operates a truck inside and outside of reservation boundaries pays the same permit fee regardless of the miles driven off-reservation. The fee is the same for non-Indians and Indians. Fees paid to the State of Washington for truck registration, licensing, and log tolerance permits are credited to the state motor fund and used primarily for highway purposes. RCW §§ 46.68.030, 46.68.035.

## B. Discussion

Plaintiffs argue that levying a tax against on-reservation activities of tribal members, regardless of the nature of the tax, is preempted by federal law, the Yakama treaty, and the Yakama Nation's sovereignty rights. Plaintiffs maintain that the licensing and permitting fees essentially tax on-reservation travel because the fees are not tailored to reflect actual off-reservation use. Defendants counter that the challenged license and permitting fees are not subject to preemption, because the fees are not based on the value of the truck. Further, the state argues that even if the fees are subject to preemption, the fees are, in practical application, pro-rated to reflect off-reservation travel.

The court agrees with plaintiffs that the proper starting point for this determination is *McClanahan v. State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). In *McClanahan*, the issue was whether Arizona could apply an income tax to reservation Indians whose income "derived wholly from reservation sources." 411 U.S. at 165, 93 S.Ct. at 1259. The Court first reiterated the policy that Indians should re-

main free from state jurisdiction and control within their political boundaries. *Id.* at 168, 93 S.Ct. at 1260. However, the Court noted:

> the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal preemption. The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power.

*Id.* at 172, 93 S.Ct. at 1262. Nevertheless, the Court found that the principle of tribal sovereignty remained relevant, "because it provides a backdrop against which the applicable treaties and federal statutes must be read." *Id.*

The Court further observed that the tradition of Indian sovereignty, combined with the canons of construction applicable to treaties, lead to the inevitable conclusion that tribes retain absolute sovereignty within those lands reserved for the exclusive use and occupancy of tribes. *Id.* at 174–75, 93 S.Ct. at 1263–64. Thus, absent Congressional action conferring state jurisdiction over Indian land, Indian tribes retain "exclusive" jurisdiction over tribal members in Indian country.

Upon finding no legislative action that conferred state jurisdiction to permit taxation, the Court held that Arizona could not impose income taxes upon reservation Indians whose income is derived entirely from within the reservation. *Id.* at 179–80, 93 S.Ct. at 1266. The Court flatly rejected the state's attempt to distinguish income taxes from property tax: "However relevant the land-income distinction may be in other contexts, it is plainly irrelevant when, as here, the tax is resisted because the State is totally lacking in jurisdiction over both the people and the land it seeks to tax." *Id.* at 180–81, 93 S.Ct. at 1267. Several Supreme Court cases have applied *McClanahan* in varying contexts, including those involving motor vehicles.

In *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), tribal members challenged Montana's assessment and collection of personal property taxes, specifically the personal property tax on motor vehicles owned by

tribal members residing on the reservation. 425 U.S. at 467–69, 96 S.Ct. at 1638–39. The motor vehicle personal property taxes were based on the value of the vehicle and imposed on vehicles driven both on and off the reservation. Relying upon the reasoning in *McClanahan*, the Court held that Montana's personal property tax could not be levied against motor vehicles owned by tribal members who resided on the reservation. *Id.* at 480–81, 96 S.Ct. at 1644–45.

In *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), Washington state imposed an "excise tax" on motor vehicles which, like the tax in *Moe*, was based on the value of the vehicle and applied to Indian-owned vehicles used both on and off-reservation. 447 U.S. at 162, 100 S.Ct. at 2086. Washington argued that the excise tax was imposed for the "use" of state highways rather than a personal property tax, and therefore *Moe* was distinguishable. *Id.* at 163, 100 S.Ct. at 2086. The Court found the distinction meritless, noting that the tax was based on the value of the vehicle, rather than on the privilege of using the vehicle in the State. Moreover, the Court declared:

> While Washington may well be free to *levy a tax on the use outside the reservation* of Indian-owned vehicles, it may not under that rubric accomplish what *Moe* held was prohibited. Had Washington tailored its tax to the amount of *actual off-reservation use*, or otherwise varied something more than nomenclature, this might be a different case.

*Id.* at 163–64, 100 S.Ct. at 2086 (emphasis added).

Finally, in *Oklahoma Tax Comm'n v. Sac and Fox Nation*, 508 U.S. 114, 113 S.Ct. 1985, 124 L.Ed.2d 30 (1993), the Court once again struck down imposition of registration fees and excise taxes as applied to Indian-owned motor vehicles within the reservation. 508 U.S. at 127–28, 113 S.Ct. at 1992–93.

The Court again remarked that the result might have been different had the state "tailored its tax to the amount of actual off-Indian country use." *Id.* at 128, 113 S.Ct. at 1993 (internal quotes omitted). Under these principles, the court addresses plaintiffs' claim.

■ First, the court summarily rejects any contention by defendants that the fees involved are "practically" tailored to reflect actual off-reservation travel by Indian members. Defendants' argument that tribal members need not purchase a license so long as they remain on the reservation completely misapprehends the issue, as does the argument that tribal members can themselves pro-rate the fees by purchasing a license only for the months they intend to travel outside the reservation.[15]

The individual plaintiffs in this case travel both on and off the reservation virtually every day that they haul logs to market. Tribal members must pay the same fee whether they travel outside the reservation eighty percent of the time or five percent of the time. Therefore, the challenged fees are not tailored to reflect off-reservation use. Consequently, the sole issue is whether the licensing and permitting fees are taxes subject to preemption.

■ It is well-established that a state may impose non-discriminatory taxes for activities conducted off-reservation. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49, 93 S.Ct. 1267, 1270–71, 36 L.Ed.2d 114 (1973). However, in the context of use taxes imposed on Indian-owned vehicles driven both on and off reservation, the state must apportion those taxes to account for actual off-reservation use of the state highways, because the state lacks jurisdiction to tax on-reservation activities of reservation Indians. *McClanahan*, 411 U.S. at 180–81, 93 S.Ct. at 1266–67; *Colville*, 447 U.S. at 163–64, 100

**15.** Apparently, defendants argument that the fees are permissible if only imposed on trucks that leave the reservation is derived from Justice Rehnquist's dissent in *Colville*. However valid Justice Rehnquist's argument, and the court makes no judgment in that respect, the majority of the Court found that a use tax may be upheld if tailored to *actual* off-reservation use as opposed to *any* off-reservation use. Therefore, the court does not consider this aspect of defendant's argument.

S.Ct. at 2086; *Sac and Fox,* 508 U.S. at 128, 113 S.Ct. at 1993.

■■■ In this case the fees are based on weight, rather than value, and the proceeds from the fees are placed in the state motor fund and used exclusively for highway purposes. Therefore, defendants correctly maintain that the fees are "essentially a tax for the use of heavy equipment on the public's highway facilities." State Defendant's Trial Brief at 32. However, the fees are applied to Indian-owned trucks driven both on and off-reservation. Therefore, the fees must be prorated to account for actual off-reservation use of the highways by tribal members. *Colville,* 447 U.S. at 163–64, 100 S.Ct. at 2086.

Moreover, the vehicles at issue are Indian-owned logging trucks hauling tribal timber to off-reservation markets. The court finds a distinction between plaintiffs' trucks and a vehicle that is driven off-reservation for reasons unrelated to on-reservation activities. Here, the vehicles are driven off-reservation to support tribal enterprises conducted within reservation boundaries. As such, the tribe has a special sovereignty interest that might not be present under different circumstances. The court recognizes that its ruling on plaintiffs' Treaty claim may render the apportionment issue moot. Nonetheless, the court alternatively finds that under *McClanahan* and its progeny, Washington's licensing and permitting fees—as currently structured—cannot be imposed against plaintiffs' logging trucks.

### Conclusion

Treaties are a country's contracts. The solemn commitment of great nations, like the given word of good men, should be honored. It should not matter if the erosion of time and the bright glare of hindsight demonstrate that they were extravagant or ill-advised. The promises made at Walla Walla all those years ago were unconditional. They will be so enforced by this court.

Upon review of the trial testimony, admitted exhibits, and briefing of the parties, the court finds that Article III, paragraph 1, of the Treaty With the Yakamas unambiguously secures to the Yakama Nation and its members the right to travel the public highways without restriction. Accordingly,

**IT IS HEREBY ORDERED** that Judgment shall be entered in favor of plaintiffs in accordance with the following:

1. Article III, paragraph 1 of the Treaty with the Yakamas of 1855 provides the Yakama Indian Nation with the right to travel on all public highways without being subject to licensing and permitting fees, or registration requirements exacting such fees, related to the exercise of that right while engaged in the transportation of tribal goods.

2. This Treaty right to travel, although secured to the Yakama Indian Nation, can be exercised by its individual members, and any Yakama-owned and operated corporation or business which is tribally licensed.

3. The Yakama Indian Nation has the autonomy to regulate and exercise the Treaty right to travel among tribal members and non-member agents or employees. However, the Yakama Nation's sovereign right to regulate the exercise of Treaty rights does not preclude state registration for Indian-owned trucks, so long as the licensing and permitting fees are not imposed.

4. The Yakama Indian Nation, its members, any Yakama-owned or operated corporations or business, and any non-members engaged in the exercise of the Yakama Indian Nation's Treaty right to travel must comply with state regulations designed to preserve and maintain the public roads and highways to the extent that those regulations do not impose a fee or surcharge on the Treaty right.

5. The Yakama Nation, its members, any Yakama-owned or operated corporation or business, must comply with state registration requirements solely for identification purposes to the extent that such requirements do not impose a fee or surcharge on the Treaty right.

6. The state's registration, licensing, and permitting fees for trucks are not tailored to account for actual off-reservation travel, and therefore are preempted by federal law. Therefore,

**IT IS FURTHER ORDERED** that plaintiff's Motion for Summary Judgment Re: McClanahan, Colville, Moe and Sac and Fox Pre–Emption Issues, **Ct.Rec. 274**, is **GRANTED** and defendants' Motion for Summary Judgment on Apportionment Claim, **Ct. Rec. 269**, is **DENIED.**

**IT IS SO ORDERED.** The Clerk is instructed to enter this Order and forward copies to counsel. The Clerk is further instructed to enter an Order of Judgment and forward copies to counsel.

### APPENDIX I

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. Since 1915, Washington has required registration and licensing of trucks according to gross weight, with higher weights bearing higher licensing fees. RCW §§ 46.16.070, 46.16.135. Trucks owned by individual Indians have never been exempt from such license fees.

2. Washington requires log tolerance permits for certain overweight trucks with payment of an accompanying fee. RCW §§ 46.44.047, 46.44.095. Individual Indians have never been exempt from such fees.

3. Washington law establishes traffic infractions for violations of the weight licensing requirements, and impose penalties for such violations. RCW §§ 46.16.010, 46.16.135, 46.16.140, 46.16.145. Fees paid to the State of Washington for truck registration, licensing, and log tolerance permits are credited to the state motor fund and used primarily for highway purposes. RCW §§ 46.68.030, 46.68.035.

4. Plaintiff–Intervenor Yakama Nation sells timber from lands held in trust by the United States for the benefit of the Yakama Nation and its members. Under the supervision of the Bureau of Indian Affairs, the Yakama Nation enters into timber sales contracts with purchasers. When possible, purchasers of tribal timber must employ tribal members. Ramsey testimony.

5. Plaintiff Richard "Kip" Ramsey, d/b/a Tiin–Ma Logging, and Delbert Wheeler, d/b/a Wheeler Logging, own logging trucks. Both Mr. Ramsey and Mr. Wheeler are enrolled Yakama Indians. Employed by purchasers of tribal timber, their companies haul timber for the purchasers to various sites designated by the purchasers. Some sites to which the timber is delivered is outside of reservation boundaries. When they haul timber, Tiin–Ma and Wheeler trucks operate on public highways at gross weights exceeding 55,000 pounds. P–54; Ramsey testimony.

6. While Ramsey and Wheeler principally haul tribal timber to the Boise Cascade mill in Yakima, they also haul timber to mills on the Columbia River, in Packwood, Washington, and occasionally to mills in the State of Oregon. Drivers for Ramsey and Wheeler travel on roads within the reservation the majority of the time.

7. Both Ramsey and Wheeler engage in hauling logs at all times of the year when weather permits.

8. Defendants are the Chief of the Washington State Patrol (WSP) and Commercial Vehicle Enforcement Officers of the WSP authorized to enforce vehicle licensing laws and other state laws pertaining to highway use.

9. Defendant officers issued traffic citations to Tiin–Ma and Wheeler Logging drivers because Kip Ramsey and Delbert Wheeler neither paid applicable tonnage licensing fees nor obtained log tolerance permits for their trucks. Recently, defendant officers began issuing citations to Tiin–Ma and Wheeler drivers for the failure to possess proper registration. All of the state enforcement actions challenged in this case happened outside the boundaries of the Yakama Indian Reservation.

10. Under the laws of the State of Washington Yakama tribal members could not license their vehicles without paying the State registration and licensing fees. Testimony of Kip Ramsey; P–54.

11. Kip Ramsey and Wheeler Logging Company cannot license their logging trucks or secure tonnage and log tolerance permits without payment of State licensing, registra-

tion and tonnage fees. Testimony of Kip Ramsey; P–54.

12. Since the inception of State laws requiring vehicle licenses and fees, the State has enforced those laws by citing Yakama Indian vehicle owners who do not license or register their vehicles.

13. The State of Washington no longer cites Yakama Tribal members for traffic infractions inside reservation boundaries. This exemption includes vehicles which are neither licensed or registered by the State.

14. Criminal and "infraction" enforcement of licensing and registration laws of the State of Washington prevent the *Cree* and *Wheeler* plaintiffs herein from obtaining licenses, registrations, and tonnage permits for their trucks without first paying state licensing, and tonnage fees. Testimony of Kip Ramsey; P–54.

15. Plaintiffs Cree and Wheeler have been subjected to significant fines by the defendants because plaintiffs have not purchased licenses and tonnage permits in compliance with the laws of the State. *See* P–9. Plaintiffs, including the Yakama Nation, contend that the Treaty With the Yakamas of 1855 precludes the state from imposing licensing and tonnage fees against Indian-owned trucks hauling tribal goods to market.

16. *Cree* plaintiffs and Wheeler Logging, including Kip Ramsey and Delbert Wheeler, intend to comply with all State laws designed to "conserve" the public highways and agree to register their trucks with the State of Washington for identification purposes. Ct. Rec. 294.

17. On June 9, 1855, the United States and fourteen Indian tribes and bands entered into a treaty, the Treaty With the Yakamas (Treaty), 12 Stat. 951 (June 9, 1855, ratified March 8, 1859, proclaimed April 18, 1959). P–1.

18. Article III, paragraph 1 of the Treaty With the Yakamas provides:

> *And provided,* That, if necessary for the public convenience, roads may be run through the said reservation; and on the other hand, the right of way, with free access from the same to the nearest public highway, is secured to them; as also the right, in common with the citizens of the United States, to travel upon all public highways.

19. The Yakamas view the Treaty as a sacred document and place special significance to each part of the Treaty as it provides them with basic rights. Yallup testimony at pp. 9–10; Walker testimony at p. 12.

20. The Treaty With the Yakamas must be construed as the Yakamas would have naturally understood the language, with ambiguous phrases construed in their favor. If the Treaty language is unambiguous, it must be construed in accordance with its plain language, notwithstanding subsequent actions of the parties.

21. Article III, paragraph 1, of the Treaty With the Yakamas, when viewed in its historical context, unambiguously reserves to the Yakamas the right to travel the public highways without restriction.

22. Article III, paragraph 1 of the Treaty provides the Yakama Indian Nation with the right to travel on all public highways without being subject to any licensing and permitting fees related to the exercise of that right while engaged in the transportation of tribal goods.

23. Prior to and at the time the treaty was negotiated, the bands comprising the Yakama Nation engaged in a system of trade and exchange with other plateau tribes as well as with more distant tribes of the Northwest coast and plains of Montana and Wyoming. The Yakamas traveled south to the Willamette Valley and possibly California for trading purposes. The Yakamas also traveled to fish on the Columbia River and its tributaries, to hunt at the "buffalo grounds" and in other regions of the Northwest, and to gather roots and berries in the mountains. P–5; P–14, D–218; P–15, D–344; P–17, D–335; P–21, D–329; Walker testimony at pp. 13–18; Richards testimony at p. 12.

24. The Yakama system of trade and exchange was necessary to obtain goods that were otherwise unavailable to them but important for sustenance and religious purposes, such as buffalo byproducts and shell-

fish. Yallup testimony at pp. 12–15, 21–22; Walker testimony at p. 16. Items Yakamas traded included fir trees, lava rocks, horses, and various species of salmon. Yallup testimony at pp. 12–15.

25. The Yakamas also traded with non-Indians, particularly the Hudson's Bay Company, to obtain other goods. P–6–8; P–14, D–218. Walker testimony at 13–18.

26. Bands comprising Yakamas, particularly Klickitats, were well-known for their inherent trading ability. P–14, D–218; P–15, D–344; Walker testimony at p. 16.

27. Travel to other regions was essential for the maintenance of the Yakama way of life. Travel enabled the Yakamas to fish, hunt, gather, trade, and maintain intermarriage cultural ties. The Yakama also obtained fish and other aquatic resources, large and small game, decorative objects, buffalo products, and other items essential to their religious practices and ultimately their survival. P–14, D–218; Yallup testimony at p. 22–24. Walker testimony at pp. 13–14, 17.

28. Subsistence activities of the Yakamas required regular, extensive travel throughout the Plateau and in the neighboring Plains. The Yakamas joined with eastern groups, such as the Nez Perce and Flathead, to journey into the Plains to hunt bison and to trade. Further, the Yakamas traveled to the mountains for hunting, berry and root-gathering. P–14, D–218; P–15, D–344; Walker testimony at p. 17.

29. Travel was especially important to the Yakamas to pursue their fishing practices. The Yakamas maintained fisheries on the Columbia River and followed salmon runs as they moved through Yakama territory. Fish was, and is, a dominant staple of Yakama life for sustenance, religious, trade, and medicinal purposes. Yallup testimony at pp. 10–12; Walker testimony at pp. 17–20; P–14, D–218.

30. The Yakamas enjoyed free and open access to trade networks in order to maintain their system of trade and exchange. Walker testimony at pp. 13–18; Yallup testimony at p. 22.

31. Prior to the negotiations of the Treaty, Governor Stevens and his subordinates were aware that the Yakamas traded both on the Pacific Coast and traveled to the Columbia River to fish and to the plains to hunt buffalo. They were also aware of the importance of travel and trade to the Yakamas and their way of life. P–2; P–14, D–218; P–15, D–344; Walker testimony at p. 22.

32. At the time of the Treaty the United States did not charge fees for travel on its public highways in the Washington Territory.

33. Yakamas' contact with whites prior to the Treaty resulted in native use of horses and firearms, which had changed their traditional tribal practices with respect to travel and hunting. Richards testimony at p. 9.

34. Yakamas' contact with whites prior to the Treaty was limited to explorers, traders, Catholic missionaries, and perhaps some settlers, although few had settled in the Yakima Valley prior to the Treaty negotiations. Richards testimony at 12–16; P–14, D–218.

35. At the time of Treaty negotiations, Isaac. I. Stevens was the Territorial Governor of the Washington Territory, Superintendent of Indian Affairs for the Washington Territory, and Chief Engineer of the Northern Division of the Pacific Railroad Surveys chartered by Congress to explore the possibility of a transcontinental railroad route. Richards testimony at pp. 23–24; P–14, D–218.

36. Stevens was pressured to quickly negotiate treaties with Eastern Washington tribes in order to free land for settlement and road-building purposes. The Oregon Donation Act, allowing for settlement without extinguishment of Indian title to land, increased the urgency for land. P–23; D–215; D–216, D–334.

37. Additionally, gaining access to the Yakama Reservation for purposes of building a railroad to Puget Sound was of vital importance to the United States and Stevens. P–23; D–216.

38. The United States believed that gaining Yakamas acquiescence to the roads across their reservation was a different and special case. The United States intended this road to be a major thoroughfare to the

coast and accordingly was willing to accommodate many of the demands of the Yakamas. P–14, D–218; P–15, D–344; P–23; D–291.

39. Stevens sent Captain George McClellan, Andrew Bolon, and James Doty to meet with the Yakamas. These men explained in general terms the intent of the federal government to treat with the Yakamas and described the anticipated provisions of the Treaty. P–14, D–218; P–15; D–344; P–17, D–335; P–24, D–348.

40. Statements by Governor Stevens and his employees prior to the Treaty negotiations and the statements of Governor Stevens and General Palmer at the Treaty negotiations reflect the importance to the United States of roads and railroad building across the Yakama Reservation. P–2; P–14, D–218; P–15, D–344; P–16; P–17, D–335; P–23; P–24, D–348.

41. Stevens' representatives found Indians who spoke Chinook jargon to interpret for them with the Yakamas and other Indians during the Treaty negotiations, even though Chinook jargon was not the primary language of any tribe. P–2; P–17, D–335; Walker testimony at pp. 38–40.

42. The Treaty proceedings formally commenced on May 29, 1855, in the Walla Walla Valley in southeastern Washington. In addition to Stevens and General Joel Palmer, Superintendent of Indian Affairs for the Oregon Territory, approximately sixty non-Indians were present. Over 1800 tribal members, including Yakamas, attended. P–2.

43. At the treaty negotiations, a primary concern of the Indians was that they have freedom to move about to fish, hunt, and gather, and trade. P–2.

44. Stevens represented to the tribes that entering into a Treaty with the United States would protect the tribes from "bad white men" and enhance their standards of living by providing agricultural equipment and training, blacksmiths, carpentry shops, and schools. P–2 at pp. 39–41, 49, 52–53. Stevens guaranteed that the terms of a Treaty would be "carried out strictly." P–2 at p. 55.

45. In discussing the purpose for the creation and placement of the Yakama Reservation, Stevens told the assembled Indians:

I will give briefly the reason for selection [of] these two reservations. We think they are large enough to furnish each man and each family with a farm, and grazing for all your animals. There is especially in winter grazing on both reservations. There is plenty of Salmon on these Reservations, there are roots and berries, there is also some game. You will be near the great road and can take your horses and your cattle down the river and to the Sound to market.

P–2 at p. 64.

46. Stevens repeatedly assured the Yakamas that they would be allowed to travel the public roads outside the Reservation "to pasture animals on land not occupied by whites, to kill game, to get berries and to go on the roads to market. P–2 at p. 69; *see also* P–2 at pp. 44, 67, 98.

47. Palmer reiterated the statements made by Stevens when he stated: "My Brother has stated that you will be permitted to travel the roads outside the Reservation." P–2 at p. 70. He further commented:

Now as we give you the privilege of traveling over roads, we want the privilege of making and traveling roads through your country, but whatever roads we make through your country will not be for injury.

P–2 at p. 71.

48. The statements of General Palmer reflect that in consideration for allowing the Yakamas to travel on the public highways, the United States bargained for the right to run highways and railroads inside the reservation. P–2 at pp. 70–71.

49. General Palmer's statements assured the Yakamas that roads across the reservation would be of no injury to the Tribe. P–2 at p. 71.

50. In reliance on the promises made by Stevens and Palmer, the Yakamas agreed to enter into the Treaty on June 9, 1855.

51. The Minutes of the Treaty proceeding reflect that the issue of highway travel by

the Yakamas outside their reservation was broached several times, reflecting the importance of off-reservation travel to the Yakamas.

52. The Minutes of the Treaty proceedings contain no mention of restrictions upon the right of travel on the public highways, nor is there mention of the possible assessment of fees for that travel. P–2.

53. After the Treaty was concluded, the Yakama Indians continued to travel and fish much as they had prior to Treaty negotiations. P–26, D–224; P–30, D–237; P–44, D–250; D–223.

54. The State of Washington did not impose any licensing or vehicle registration fees for road purposes until at least 1905.

55. In 1932, approximately 128 Indian-owned vehicles were licensed pursuant to Washington law. However, it was estimated that on-reservation Indians owned approximately 500 vehicles during that year. P–47, D–451.

56. In 1986, the Yakama Nation Tribal Council enacted a regulation providing for Tribal regulation of member owned vehicles. D–280.

57. The Yakama Nation and its members consistently objected to State schemes of taxation for the purpose of building roads across the Reservation and state financing proposals that would charge the Yakamas. Yallup testimony at pp. 54–55; P–40; P–45, D–450; P–48, D–465.

58. Since the inception of Tiin–Ma Logging's log hauls, plaintiff Kip Ramsey has protested the defendant's registration, licensing and tonnage fee collection system.

59. Individual plaintiffs previously and successfully litigated their Treaty right to travel in state and federal court. P–51; P–52; P–53. In each case, a court found that Washington truck licensing and permitting fees violated plaintiffs' Treaty travel rights.

60. Article III, paragraph 1, secures rather than restricts the Yakamas' right to travel the public highways "in common with" non-Indians. However, neither the Treaty language nor statements made during the Trea-

ty negotiations define the scope of "in common with." No equivalent of this phrase exists in Chinook jargon. P–1; P–55; P–56; Walker testimony at p. 24. At best, the Yakamas had a rudimentary understanding of the phrase "in common with."

61. In the Yakama language, the term "in common with" would suggest public use or general use without restriction. Therefore, as the Yakamas understood this term, no impediment would be placed on their right to travel. The most the Indians would have understood, reading the Treaty as a whole and its interpretive Minutes, of the term "in common with" and "public" was that they would share the use of the roads with whites. Walker testimony at 30.

62. Reading of the Treaty language as a whole reflects that the term "public highways" should be read with its common understanding, meaning a road open to all or for common usage.

63. Stevens and his representatives, both prior to and at the Treaty negotiations, clearly indicated that the roads they were discussing with the Indians were "public" roads open to all the settlers. P–2; P–17, D–335 at pp. 4, 7, 11, 14, 15; P–23; P–24, D–348.

64. The term "in common with" in Article III implies that the Indian and non-Indian use will be joint but does not imply that the Indian use will be in any way restricted.

65. Stevens and Palmer promised, and the Indians understood, that the Yakamas would forever be able to continue the same off-reservation food gathering and fishing practices as to time, place, method, and extent.

66. Stevens' and Palmer's statements regarding the Yakama's use of the public highways to take their goods to market clearly and without ambiguity promised the Yakamas the use of public highways without restriction for future trading endeavors.

67. The "great roads" referred to by Governor Stevens in the Treaty Minutes included proposed roads across the Yakama Reservation which were intended to provide access to Puget Sound. There was no suggestion that the Yakamas use of them would be restricted in any way. P–2 at pp. 64, 76.

68. The language of Article III of the Treaty reflects the promises made by Stevens and Palmer in the Treaty discussions and guarantees to the Yakamas the right of free use of the public highways. P–1; P–2.

69. The minutes of the Treaty proceedings reflect that unrestricted travel upon the public highways outside reservation boundaries was an issue of significant importance to both the Yakamas and Governor Stevens. P–2.

70. The Minutes of the Treaty proceedings and the language of Article III reflect no restrictions upon the right of the Yakamas to use the public highways, either for traditional practices of fishing, hunting, gathering and trade, or for future economic endeavors. P–1; P–2.

71. The fishery language of Article III, paragraph 2, is identical to the public highway language contained in Article III, paragraph 1. P–1. Nothing appears in the factual record which would lead the court to interpret the identical public highway language differently than the manner in which the fishery language has been interpreted.

72. In the historical context of the Treaty, including Stevens' mission to free vast amounts of land for settlement as quickly as possible and the Yakamas' reluctance in entering a treaty with the United States, it is unlikely that Stevens intended to restrict the Yakamas travel in any significant manner.

73. No evidence suggests that Stevens communicated an intent to restrict the Yakamas' right to travel for fishing, hunting, gathering, and trade purposes. Further, Stevens did not communicate an intention to assimilate Yakamas with non-Indians or otherwise place the Yakamas on "equal footing" with non-Indians.

74. Evidence suggests that Stevens intended to rely upon federal funds for the construction of roads in Washington Territory. D–334.

75. The branding of horses was not a method of "registering" the Yakamas' method of transportation for purposes of State regulation. D–297. Rather, the branding of horses was a means whereby Yakama Indians and others could identify their horses and cattle. The branding of horses by Yakama Indians is not inconsistent with the Yakamas' claim of free travel upon the public highways.

76. No evidence shows that the Yakamas utilized toll roads or ferries prior to the Treaty. Moreover, the Barlow Road toll charge was the exception rather than the rule at the time of the Treaty. Richards testimony at pp. 122.

77. Even if the Yakamas had paid tolls for use of the Barlow Road or ferries, such actions would not be inconsistent with their claimed Treaty right to travel, because payment of such tolls was not within the context of Treaty negotiations.

78. The fact that plaintiffs did not assert a Treaty travel right with respect to hauling tribal goods to market until 1981 does not diminish their claimed right. Individual plaintiffs did not begin hauling goods off-reservation to outside markets until the 1970s.

79. The challenged truck licensing and permitting fees are revenue-raising rather than regulatory in nature. Ct.Rec. 133. The regulatory purpose of these fees can be accomplished without the imposition of fees because plaintiffs maintain they will remain subject to the weight regulations so long as a fee is not imposed. Further, plaintiffs will not contest a fine imposed for violations of the weight regulations.

80. The Treaty right to travel, although secured to the Yakama Indian Nation, can be exercised by its individual members, and any Yakama-owned and operated corporation or business, which is tribally licensed.

81. The Yakama Nation's retained sovereignty under its Treaty includes the right to regulate the conduct of its members in the exercise of Treaty rights both on and off the Yakama Reservation. *Settler v. Lameer*, 507 F.2d 231 (9th Cir.1974).

82. The Yakama Nation's retained sovereignty under the Treaty reserves to it the right to determine what activities its members may exercise off the Reservation.

83. The Yakama Indian Nation has the autonomy to regulate and exercise this right through the use of member and non-member agents or employees. However, the Yakama Nation's sovereign right to regulate the exercise of Treaty rights does not preclude the state's registration requirements for trucks, so long as the licensing and permitting fees are not imposed.

84. The Yakama Indian Nation, its members, any Yakama-owned or operated corporations or business, and any non-members engaged in the exercise of the Yakama Indian Nation's Treaty right to travel must comply with state regulations designed to preserve and maintain the public roads and highways to the extent that those regulations do not impose a fee or surcharge on the Treaty right to travel on said public roads or highways.

85. The Yakama Nation, its member, any Yakama-owned or operated corporation or business, must comply with state registration requirements solely for identification purposes to the extent that such requirements do not impose a fee or surcharge on the Treaty right to travel.

86. Washington State has no statutory system to pro-rate licensing, registration or tonnage fees to reflect on and off reservation use by Indian-owned trucks based on the mileage driven in each jurisdiction.

87. The apportionment system proposed by defendants which allows for purchase of fees only during the time of use of an Indian-owned trucks off-reservation costs the same for a tribal member as it does for a non-Indian who has no exemption for on-reservation use. Therefore, Washington state licensing and permitting fees are not tailored to account for actual off-reservation use by Indian-owned trucks.

88. Plaintiffs possess a special sovereignty interest in hauling tribal goods, derived wholly from reservation resources, to off-reservation markets.

89. Under relevant Supreme Court caselaw, fees imposed on Indian-owned vehicles for the use of state highways must be apportioned to account for actual off-reservation use.

90. The state's registration, licensing, and permitting fees for trucks are not apportioned to account for on-reservation travel, and therefore are preempted by federal law.

## APPENDIX II

The court reviewed the following exhibits in this case:

Plaintiffs' Exhibits

| | | |
|---|---|---|
| P–1 | P–15 | P–35 |
| P–2 | P–17 | P–36 |
| P–4 | P–19 | P–37 |
| P–5 | P–20 | P–40 |
| P–6 | P–21 | P–44 |
| P–7 | P–22 | P–45 |
| P–8 | P–23 | P–47 |
| P–9 | P–24 | P–51 |
| P–10 | P–26 | P–52 |
| P–11 | P–28 | P–53 |
| P–12 | P–30 | P–54 |
| P–13 | P–31 | P–55 |
| P–14 | P–32 | P–56 |

Defendants' Exhibits

| | | |
|---|---|---|
| D–204 | D–269 | D–315 |
| D–205 | D–275 | D–317 |
| D–206 | D–277 | D–318 |
| D–207 | D–278 | D–334 |
| D–208 | D–280 | D–335 |
| D–209 | D–281 | D–336 |
| D–210 | D–282 | D–337 |
| D–211 | D–283 | D–343 |
| D–212 | D–284 | D–344 |
| D–213 | D–285 | D–348 |
| D–214 | D–286 | D–350 |
| D–215 | D–287 | D–352 |
| D–216 | D–291 | D–355 |
| D–217 | D–292 | D–368 |
| D–218 | D–293 | D–375 |
| D–219 | D–294 | D–378 |
| D–220 | D–295 | D–379 |
| D–222 | D–296 | D–389 |
| D–223 | D–297 | D–390 |
| D–224 | D–299 | D–393 |
| D–230 | D–301 | D–394 |
| D–231 | D–302 | D–397 |
| D–232 | D–303 | D–398 |
| D–234 | D–304 | D–399 |
| D–241 | D–305 | D–400 |
| D–242 | D–306 | D–401 |
| D–244 | D–307 | D–451 |
| D–246 | D–310 | D–512 |
| D–256 | D–312 | D–514 |
| D–258 | D–313 | D–520 |

All other proposed exhibits were excluded pursuant to the Court's Order Re: Plaintiffs' Objections to Defendants' Exhibits (Ct.Rec. 297) and the court's ruling that all unchallenged exhibits shall be admitted, except those exhibits not referenced by either party during trial or in trial memoranda.